STATE OF CONNECTICUT *v.* JASON L'MINGGIO
(AC 22787)

Foti, Dranginis and Healey, Js.

 

Argued May 28—officially released August 20, 2002

*Lisa J. Steele*, special public defender, for the appellant (defendant).

*Christopher T. Godialis*, assistant state's attorney, with whom, on the brief, was *Mary M. Galvin*, state's attorney, for the appellee (state).

FOTI, J. The defendant, Jason L'Minggio, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a[1] and carrying a pistol or revolver without a permit in violation of General Statutes § 29-35 (a).[2] On appeal, the defendant claims (1) that the trial court abused its discretion, and violated his rights to present a defense and to testify, when it excluded certain testimony, (2) that the court improperly instructed the jury as to the crime of carrying a pistol or revolver without a permit and (3) that the prosecutor, during her closing argument, committed prosecutorial misconduct that deprived him of a fair trial. We affirm the judgment of the trial court.

The relevant facts underlying this conviction, as the jury reasonably could have found them, began to unfold

---

[1] General Statutes § 53a-55a (a) provides in relevant part: "A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm. . . ."

[2] General Statutes § 29-35 (a) provides in relevant part: "No person shall carry any pistol or revolver upon one's person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same issued as provided in section 29-28. . . ."

The defendant was charged, in a substitute information, with murder in violation of General Statutes § 53a-54a. The jury acquitted him of that charge, but found him guilty of the lesser included offense of manslaughter in the first degree with a firearm. The jury also found the defendant guilty of having committed a felony while armed with a firearm, thereby subjecting the defendant to the sentence enhancement provision codified in General Statutes § 53-202k. That section provides: "Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3, except an assault weapon, as defined in section 53-202a, shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony." Manslaughter in the first degree with a firearm is a class B felony. General Statutes § 53a-55a (b).

on October 16, 1998, during a high school football game in West Haven. Sometime prior to the end of the game, several individuals attending the game became involved in a physical confrontation. During the incident, Nyron Dumas, the defendant's thirteen year old brother, sustained stab wounds. Several eyewitnesses told police that Larry Mayes had stabbed Dumas. The next morning, the defendant, then aged sixteen, told an acquaintance that he would "put [Mayes] in a body bag."

During the afternoon of October 17, 1998, the defendant and two acquaintances, Jeremiah Jeter and Fred Dennison, were standing outdoors near the defendant's apartment in West Haven. Mayes approached the defendant and his acquaintances on foot. Shortly thereafter, the defendant began yelling at Mayes. The defendant walked into a nearby wooded area and retrieved a semiautomatic pistol. As Jeter and Dennison looked on, the defendant fired several shots at Mayes. Mayes began yelling and attempted to flee the scene. The defendant shot Mayes in each of his legs; the gunshot wound to Mayes' left leg was fatal.

After the shooting, the defendant went to his apartment, washed his hands with bleach, retrieved his mother's car keys and drove off in his mother's car with Jeter and Dennison. An eyewitness reported the shooting to police, who apprehended and arrested the defendant in Bridgeport several days later following a pursuit on foot.

I

In support of his theory of defense, the defendant attempted to demonstrate that Jeter had shot Mayes. The defendant sought to introduce his own testimony concerning conversations he had with Jeter before and after the shooting. The defendant also sought to introduce his testimony as to why he had fled from police after the shooting. On appeal, the defendant claims

that in several instances, the court improperly excluded such testimony. He argues that the court's rulings violated his constitutional rights to present a defense and to testify. We disagree.

Before addressing each of the court's challenged rulings in turn, we first set forth our standard of review. The defendant concedes that at trial, he did not challenge the court's rulings on constitutional grounds, as he does on appeal. "Once an objection has been made and the grounds stated, a party is normally limited on appeal to raising the same objection *on the same basis* as stated at trial." (Emphasis added.) *State* v. *Adams*, 225 Conn. 270, 287 n.12, 623 A.2d 42 (1993). The defendant requests review of his claims under the four part standard set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[3] We decline to afford *Golding* review to the defendant's claims because they are evidentiary, and not constitutional, in nature. As such, they fail under *Golding*'s second prong.

This court has stated that "[a] defendant's right to present a full defense, including the right to testify on his own behalf, is not without limits. In responding to the charges against him, an accused must comply with the established rules of procedure and evidence, as must the prosecution, in order to insure a fair trial. . . . A criminal defendant's right to present a full defense and to receive a fair trial does not entitle him to place before the jury evidence normally inadmissible." (Citation omitted; internal quotation marks omitted.) *State* v.

---

[3] In *Golding*, our Supreme Court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

*Rogers,* 9 Conn. App. 208, 214, 518 A.2d 399 (1986), cert. denied, 202 Conn. 806, 520 A.2d 1288, cert. denied, 481 U.S. 1051, 107 S. Ct. 2185, 95 L. Ed. 2d 841 (1987).

Furthermore, "the right to present a defense does not include the right to offer evidence that is incompetent, irrelevant or otherwise inadmissible. . . . Every evidentiary ruling that denies a defendant a line of inquiry to which he thinks he is entitled is not constitutional error." (Citation omitted; internal quotation marks omitted.) *State* v. *Jones,* 46 Conn. App. 640, 646, 700 A.2d 710, cert. denied, 243 Conn. 941, 704 A.2d 797 (1997). "The trial court retains the power to rule on the admissibility of evidence pursuant to traditional evidentiary standards." (Internal quotation marks omitted.) *State* v. *Bridges,* 65 Conn. App. 517, 524, 782 A.2d 1256, cert. denied, 258 Conn. 934, 785 A.2d 230 (2001).

Because the claims are evidentiary in nature and were preserved at trial on such grounds, we will review them according to a familiar standard of review. "Our standard of review regarding challenges to a trial court's evidentiary rulings is that these rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. . . . It is a well established principle of law that the trial court may exercise its discretion with regard to evidentiary rulings, and the trial court's rulings will not be disturbed on appellate review absent abuse of that discretion. . . . Sound discretion, by definition, means a discretion that is not exercised arbitrarily of wilfully, but with regard to what is right and equitable under the circumstances and the law. . . . And [it] requires a knowledge and understanding of the material circumstances surrounding the matter . . . . In our review of these discretionary determinations, we make every reasonable presumption in favor of upholding the trial court's ruling." (Internal quotation

marks omitted.) *State* v. *Vasquez*, 68 Conn. App. 194, 199–200, 792 A.2d 856 (2002).

Further, even if the defendant can demonstrate that the court's ruling reflects an abuse of discretion, "[u]nder the current and long-standing state of the law in Connecticut, the burden to prove the harmfulness of an improper evidentiary ruling is borne by the defendant. The defendant must show that it is more probable than not that the erroneous action of the court affected the result." (Internal quotation marks omitted.) *State* v. *Lewis*, 67 Conn. App. 643, 653, 789 A.2d 519 (2002).

The excluded testimony that is the subject of the defendant's claims falls into three general categories: (1) statements made by the defendant and Jeter before the shooting; (2) statements made by the defendant and Jeter after the shooting; and (3) testimony concerning the defendant's state of mind.

A

At trial, the defendant testified that just prior to the shooting, Jeter had told him, " 'Hey, yo, I'm about to scare [Mayes]' . . . . He said, 'I'm about to scare him.' " The state objected on hearsay grounds. The defendant's counsel argued that the evidence was relevant to "state of mind." The court struck the statement on hearsay grounds, noting that the defendant was "testifying directly as to a conversation that he says he heard."

The defendant then testified that Jeter walked to where Mayes was standing and that while Jeter was holding a gun at his side, Jeter said to Mayes, " 'Hey, yo, you know you violated the fam, right?' " The state objected and the defendant's counsel responded to the objection by stating "state of mind." The court stated: "That's not state of mind . . . . This is an observation that he's making. What state of mind is there? I'll sustain

the objection. Ladies and gentlemen [of the jury], you can accept whatever this witness testifies to as to what he observed. Any conversations that he relates from a third party, you're to strike from your mind and memory."

Immediately thereafter, the defendant testified that Mayes said to Jeter, " 'What do you mean?' " The defendant next testified that Jeter told Mayes, " 'You know what I mean.' " The state immediately objected, and the court again disallowed the testimony and instructed the defendant to describe what he observed and not to relate conversations to the jury.

"[A]n out-of-court statement that is offered to establish the truth of the matter asserted is inadmissible hearsay unless the statement falls within a recognized exception to the hearsay rule. . . . An out-of-court statement is not hearsay, however, if it is offered to illustrate circumstantially the declarant's then present state of mind, rather than to prove the truth of the matter asserted. . . . Of course, for any such out-of-court statement to be admissible, it must be relevant to an issue in the case." (Citations omitted; internal quotation marks omitted.) *State* v. *Wargo*, 255 Conn. 113, 137–38, 763 A.2d 1 (2000).

The court properly declined to admit the defendant's testimony concerning what Jeter or Mayes allegedly said prior to the shooting. The statements were hearsay. Although the defendant apparently sought to introduce the statements for the purpose of demonstrating the defendant's then existing state of mind, the statements did not support such a use. That is because the defendant did not make the statements. The court properly concluded that the defendant could not use statements made by Jeter or Mayes to demonstrate his own then existing state of mind.

## B

The defendant also testified that after Jeter shot Mayes, he "snatched" the gun from Jeter's hand and said, " 'What the fuck?' " The state objected, arguing that it was self-serving hearsay. The court ruled that the defendant could not testify as to what he had said.

The defendant also testified that when he tried to take the gun away from Jeter, Jeter said, " 'Give me— .' " The court sustained the state's objection, again reminding the jury to disregard anything that the defendant testified that Jeter had said to him.

Later in his testimony, the defendant attempted to relate statements that Jeter had made to him when they were driving from the scene of the shooting. The defendant's counsel asked the defendant to relate what Jeter had told him about what had happened. The court sustained the state's objection.

Shortly thereafter, the defendant's counsel again asked the defendant to relate what he had said to Jeter and what Jeter had said to him concerning the shooting. The state objected to that line of questioning, and the court excused the jury to hear the legal argument of the defendant's counsel. The defendant's counsel offered the statement under § 8-6 (4) of the Connecticut Code of Evidence. He argued that the statements were admissible as statements by Jeter against his penal interest. The state argued that the statements were inadmissible because they were not supported by any corroborating evidence. The court ruled that despite the fact that the statements allegedly were made shortly after the incident and were against Jeter's penal interest, the statements were inadmissible because they were both uncorroborated and self-serving. The court ruled that because the defendant sought to testify as to what a third party said regarding having committed a crime, the court needed to find that such statements

were trustworthy before they could be admitted into evidence. The court found that the proffered testimony was not trustworthy.

The defendant's out-of-court statement to Jeter immediately after the shooting was hearsay. We find no support for the defendant's claim that a defendant may testify as to any and all of his or her relevant out-of-court statements. Although we agree with the defendant that a court should not automatically exclude relevant statements made by a defendant simply because they may be described as "self-serving," a party nevertheless must demonstrate that a hearsay statement falls within a recognized exception to the hearsay rule.

The defendant failed to articulate a basis on which the court should have admitted the hearsay statement into evidence, and he fails to articulate such a basis before this court. Absent such a showing, we conclude that the court properly excluded the testimony.[4]

The defendant also argues that the court improperly precluded him from testifying as to what Jeter allegedly had said about having shot Mayes. At trial, the defendant's counsel argued that such hearsay statements were admissible as statements made by Jeter against his penal interest. Hearsay statements against a declarant's penal interest may be admissible as an exception to the hearsay rule. As a general rule, the admissibility of such statements is dependent on the statement's trustworthiness. *State* v. *Hernandez*, 204 Conn. 377, 390, 528 A.2d 794 (1987).

"Four considerations have been deemed relevant when examining the trustworthiness of declarations

---

[4] We note the well settled exception to the rule against hearsay for statements by a party opponent. Conn. Code Evid. § 8-3 (1). That rule is not implicated in this case because the defendant sought to introduce his own statement.

against penal interest: (1) the time of the declaration and the party to whom the declaration was made; (2) the existence of corroborating evidence in the case; (3) the extent to which the declaration is really against the declarant's penal interest; [and] (4) the availability of the declarant as a witness. . . . No single factor in the test for determining trustworthiness is necessarily conclusive . . . the factors are reflective of the fact that there can be no precise formulation of the proof which would constitute sufficient evidence of the trustworthiness of such declarations." (Citation omitted; internal quotation marks omitted.) *Morant* v. *State*, 68 Conn. App. 137, 169, 802 A.2d 93, cert. denied, 260 Conn. 914, 796 A.2d 558 (2002); see also Conn. Code Evid. § 8-6 (4).

In the present case, the court properly considered the factors relevant to the proper exercise of its discretion. It found that Jeter allegedly had uttered the statements shortly after the shooting and that the statements were in fact against Jeter's penal interest. The court also found, however, that the statements were uncorroborated and that they were self-serving. The court explicitly found that the statements were not trustworthy. We conclude that the court was well within its discretion in finding that the testimony was not sufficiently trustworthy to merit admittance under the exception to the hearsay rule for declarations against penal interest.

C

The defendant's counsel asked the defendant why he left the scene of the shooting. The state immediately objected on the ground that any such testimony would permit the defendant to make excuses for his conduct. The defendant's counsel responded that such testimony would be admissible as evidence of the defendant's state of mind. The court disallowed the questioning,

reasoning that the testimony was self-serving. The court ruled that the defendant could testify as to what he did, but that he could not testify as to why he did what he did.

Also, the defendant wanted to testify concerning what a police officer had told him on the night of October 16, 1998, after the defendant's brother had been stabbed. The jury heard evidence, in the form of the defendant's statement, that a police officer had informed him that if anything happened in the form of retaliation for the stabbing, the defendant would be blamed for such retaliatory conduct. The defendant's counsel again asked the defendant why he had left the scene of the shooting. The state timely objected, and the court disallowed the defendant's answer. The defendant's counsel argued that such testimony would afford the defendant an opportunity to explain that the statement that the police officer had made to him resulted in his flight from the police after the shooting. The court reasoned that the statement was in evidence, spoke for itself and required no further explanation from the defendant.

The defendant argues that those rulings precluded him from explaining why he left the scene of the shooting and why he attempted to elude police. He argues that the proffered testimony was relevant evidence of his state of mind.

"There is no rule in this jurisdiction which prevents a witness from testifying to relevant facts within his personal knowledge merely because his testimony may be self-serving. Such an extraordinary rule presumably would disqualify as witnesses most parties in civil suits as well as the defendant in a criminal case. . . . We have repeatedly upheld against constitutional challenge an instruction that the jury in weighing the credibility of an accused's testimony may consider his interest in the outcome of the case. . . . This instruction is

presupposed by our recognition and acceptance of the fact that the testimony of an accused may be self-serving. It is the task of the cross-examiner to discredit a witness by exposing his motive or interest in testifying. . . . The ultimate issue, credibility, is for the [fact finder], not the court, to decide." (Citations omitted; internal quotation marks omitted.) *State* v. *Finley*, 34 Conn. App. 823, 828–29, 644 A.2d 371, cert. denied, 231 Conn. 927, 648 A.2d 880 (1994).

Insofar as the court found that the defendant's mental condition bore relevance to the jury's assessment of his conduct, it may not automatically exclude as inadmissible the defendant's description of his mental state or explanation for his conduct. "We have consistently held that mental condition is a fact, and, where relevant to an issue in the case, the witness concerned may testify directly to it. . . . The defendant's testimony as to his prior mental condition was not hearsay because it concerned a fact within his own personal knowledge. His testimony with regard to this fact was no more and no less self-serving than his testimony with regard to any other fact." (Internal quotation marks omitted.) Id., 829. Accordingly, we conclude that the court improperly excluded the defendant's testimony in that regard.[5]

Our determination that the court abused its discretion in those specific evidentiary rulings does not conclude our analysis. Because we have already concluded that the claim before us does not implicate constitutional concerns, we next ask whether the defendant has met his burden of demonstrating that the court's rulings were harmful.

The defendant, in his brief, concedes that despite the court's rulings, he "was eventually able to testify about

---

[5] We note that the state, in its brief, concedes that the prosecutor improperly objected to that testimony and that the court should have permitted the defendant to respond to the inquiries.

his reasons for leaving the scene with Jeter and Dennison, but the explanation was badly weakened by the prolonged effort it took to get [such testimony] before the jury." Our review of the record reflects that the defendant testified that he fled the scene of the shooting and traveled to Bridgeport because (1) he was afraid that police would blame him for the shooting, (2) he was generally afraid, and (3) because both he and Dennison did not want to inform police that their friend, Jeter, had shot Mayes.

The defendant cannot demonstrate that the court's ruling prevented him from testifying as to the fact of his state of mind. Furthermore, the issue of his state of mind was not relevant to the central issue in the case. The state presented eyewitness testimony, from several witnesses, as to the fact that the defendant shot and killed Mayes. The issue of the defendant's actions, whether he shot Mayes, rather than the issue of the defendant's state of mind, was central to the case and underlies the conviction. Accordingly, we do not conclude that "it is more probable than not that the erroneous action of the court affected the result." (Internal quotation marks omitted.) *State* v. *Lewis*, supra, 67 Conn. App. 653.

## II

The defendant next claims that he is entitled to a new trial on the charge that he unlawfully carried a firearm in violation of § 29-35 (a) because the court improperly instructed the jury as to that charge.[6] We disagree.

In addition to charging the defendant with the crime of murder, the state charged, in a long form information, that the defendant "did carry a pistol or revolver upon his person without a permit to carry same issued as

---

[6] See footnote 2.

provided by law in violation of [§ 29-35 (a)]." At trial, the state adduced eyewitness testimony from Martez Elliot that supported a finding that the defendant held a gun at some point during the shooting incident. Further, the state adduced eyewitness testimony from Victor Rosario that supported a finding that the defendant used the gun to shoot Mayes. Additionally, the defendant testified that after Jeter shot Mayes, the defendant grabbed the gun from Jeter's hand. The defendant testified that he transferred the gun from his left hand to his right hand and that after about fifteen to twenty seconds, Jeter yanked it out of his hands. The defendant admitted that he "held the gun without a permit."

The court instructed the jury as to the charge of carrying a pistol or revolver without a permit.[7] The

---

[7] The court charged the jury in relevant part: "And on the gun charge, possession of a weapon or a revolver without a permit. The defendant, again, admitted that he didn't have a permit, but at some point, he held the gun and that he was under twenty-one years of age. So, the only real question here is did he possess the gun, as the state charges? Or did he grab for it when the other gentleman, that he claims, was the shooter? That's up to you to decide, ladies and gentlemen. But clearly, the facts as to his age, not having a permit—at least, some point, holding onto the gun, those appear to be admitted. But I'll leave that up to you in your final conclusions."

The court continued its charge on that count as follows: "[T]he charge here is under [General Statutes § 29-35 (a)]. No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same. And as I commented to you earlier, ladies and gentlemen, if you believe the defendant had possession of the weapon, clearly wasn't within his dwelling house, clearly wasn't in his place of business. And it clearly was not with a permit to carry the same. But then, again, I just comment on that as I recall the testimony. It will be up to you to decide whether or not the state has proven those charges beyond a reasonable doubt.

"Now, let me describe to you possession. There are two ways in which a person can have possession of a weapon. It may be actual or constructive. And I'm going to define both for you. Possession, actual or constructive, may be proven by either direct or circumstantial evidence. In reference to circumstantial evidence, I will instruct you on what inferences you may or may not make. Keep in mind that possession of a weapon is not ownership. All that is required is either actual possession or constructive possession. One or the other, not both, ladies and gentlemen. Actual possession is established when it is shown that the defendant had actual possession of

defendant did not file a written request to charge for that alleged crime and failed to object to the court's instruction. He seeks review of his unpreserved claim of instructional error under *State* v. *Golding*, supra, 213 Conn. 239–40. We will review the claim because the record affords us an adequate basis on which to do so and because the claim is of constitutional magnitude. "[A]n improper jury instruction as to an essential element of the crime charged may result in the violation of the defendant's due process right to a fair trial . . . ." (Internal quotation marks omitted.) *State* v. *Smith*, 70 Conn. App. 393, 398, 797 A.2d 1190 (2002). The defendant's claim fails, however, under *Golding*'s fourth

the weapon. And ladies and gentlemen, there's no dispute that the barrel of the gun here, if you believe that that was the gun used, was under the twelve inches. So, you don't have to consider that. Uh, all you have to determine is whether this defendant had actual or constructive possession of the weapon that the state offered into evidence.

"Constructive possession is established when it's shown that the defendant exercised dominion and control over the weapon and had actual knowledge of its presence. Remember, then, constructive possession requires a showing of two things: Control and knowledge. Constructive possession may be exclusive or shared by others. The latter is known as joint possession. Control is to be given its ordinary meaning. That is to say, the defendant is in control of the weapon when it is shown that he exercises a direct control over it. Coupled with possession . . . in the first element is the requirement of knowledge. The state must prove, beyond a reasonable doubt, that the defendant knowingly possessed the weapon. A person acts knowingly, with respect to possessing the weapon, when he is aware that he is in possession of it. The mere presence of the defendant at that terrain—uh, that area outside the housing project, is not sufficient to support a finding of constructive possession. However, presence is a material and probative factor for you to consider along with all of the other evidence in the case.

"The state has submitted evidence here to show that the defendant had control over this weapon. And it's up to you to decide whether he did or not. Control of the weapon, if you believe that there was such, gives rise to the inference of unlawful possession. And the mere access by others to the weapon is insufficient to defeat this inference. If it is proven that the defendant is the exclusive owner or possessor of that weapon, then you may infer that he controlled the weapon. However, when it is shown that ownership or control or use is shared, you may no longer make this inference. The ability to control the weapon must be established by proof as to that fact."

prong because the state has demonstrated the harmlessness of the alleged constitutional violation beyond a reasonable doubt. See footnote 8.

Having reviewed the court's instruction regarding § 29-35 (a), we agree with the defendant that it improperly included an explanation of the principles of constructive possession. Those instructions were not necessary. "General Statutes § 29-35 has only two essential elements. One is carrying a pistol while outside a dwelling house or place of business. The other is the absence of a permit." *State* v. *Tinsley*, 181 Conn. 388, 403, 435 A.2d 1002 (1980), cert. denied, 449 U.S. 1086, 101 S. Ct. 874, 66 L. Ed. 2d 811 (1981). According to the defendant, the contested issue at trial, with regard to that charge, was whether the defendant *carried* any pistol or revolver in a manner prohibited by the statute.

This court has explained that "carrying and possession are different concepts" and that § 29-35 (a) "is designed to prohibit the carrying of a pistol without a permit and not the possession of one." *State* v. *Williams*, 59 Conn. App. 603, 608, 757 A.2d 1191, cert. denied, 254 Conn. 946, 762 A.2d 907 (2000). This court has considered the definition of "carry," for purposes of the statute, and concluded that "a showing of asportation is unnecessary." *State* v. *Hopes*, 26 Conn. App. 367, 374, 602 A.2d 23, cert. denied, 221 Conn. 915, 603 A.2d 405 (1992). In *Hopes*, this court concluded that the requirement that the pistol or revolver was carried is satisfied if it shown that it was "within the defendant's control or dominion in a public area." Id., 375.

The defendant argues, and the state agrees, that the court included extraneous instructions in its charge insofar as it instructed the jury on constructive possession. We also agree. The state argues, however, that the instructional error is harmless beyond a reasonable doubt. Our Supreme Court has stated that "an instruc-

tional constitutional error is harmless if there is no reasonable possibility that the jury was misled . . . . An alleged defect in a jury charge which raises a constitutional question is reversible error if it is reasonably possible that, considering the charge as a whole, the jury was misled. . . . [T]he test for determining whether a constitutional error is harmless . . . is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Spillane*, 255 Conn. 746, 757, 770 A.2d 898 (2001). Stated otherwise, the Supreme Court has emphasized that a reviewing court should consider the challenged instruction's "probable effect upon the jury in guiding [it] to a correct verdict in the case." (Internal quotation marks omitted.) *State* v. *Williams*, 258 Conn. 1, 26, 778 A.2d 186 (2001).

In the present case, we conclude that the state has demonstrated that any instructional error was harmless beyond a reasonable doubt. We do so because it is clear that any instructional error with regard to the definition of "carry" had no probable effect on the jury. The state did not charge that the defendant had constructively possessed a pistol or revolver in violation of § 29-35 (a), nor did the state base its case, in any manner, on such a theory. The state charged the defendant with having murdered Mayes. The jury, in reaching a verdict of manslaughter in the first degree with a firearm, necessarily found that the defendant had used a firearm to shoot and kill Mayes. Accordingly, the jury necessarily found that the defendant, at some point, had carried the pistol that he used to complete the act. "An erroneous instruction on an element of the offense can be harmless beyond a reasonable doubt, if, given the factual circumstances of the case, the jury could not have found the defendant guilty without making the proper factual finding as to that element. *United States* v. *Doherty*, 867 F.2d 47, 58 (1st Cir.), cert. denied, 492 U.S. 918, 109 S.

Ct. 3243, 106 L. Ed. 2d 590 (1989)." *State* v. *Woods*, 23 Conn. App. 615, 623, 583 A.2d 639 (1990).

For those reasons, the defendant's unpreserved claim of instructional error fails under *Golding*'s fourth prong.[8]

### III

Finally, the defendant claims that the prosecutor, during her closing argument, committed prosecutorial misconduct that deprived him of a fair trial. We disagree.

The defendant's claim focuses on the prosecutor's references to the type of bullets that the defendant used in the shooting. During her closing argument, the prosecutor referred to the bullets as both "killer bullets"[9] and "[f]lesh ripping, killer bullets."[10] The defen-

[8] For the same reasons, we need not consider the defendant's alternate argument that in its charge, the court improperly suggested to the jury that his "admitted momentary holding of the handgun was a violation of [General Statutes § 29-35 (a)]." From the verdict reached, it is clear that the jury did not find credible the defendant's testimony that he grabbed the handgun from Jeter and held it for a matter of seconds in an attempt to stop Jeter's actions.

[9] The prosecutor asked the jury to "review the testimony that has been heard over the last couple of weeks as to what happened on that fateful weekend in the fall of 1998, when the Mayes family lost their son to killer bullets."

[10] The prosecutor argued in pertinent part: "I think the only thing defense may argue is intent to cause death. And what do we have on that? Well, one, [the defendant's statement to an acquaintance that] 'I'm going to put that boy in a body bag.' If that's not intent to cause death, what is? Plus we have Hydra-Shok, hollow point, flesh ripping, killer bullets. We have a nine millimeter gun. This is not a situation where Larry Mayes was beaten or where some other weapon was taken out. . . . [T]he facts are, this is a killer. And it's enough of a killer without putting killer bullets in it. You heard [Harold Wayne Carver, the state's chief medical examiner, testify]; these are bullets that shred flesh. And in this case, they shred Larry Mayes' artery."

Later in her argument, the prosecutor argued: "This was not a pea shooter. This was a deadly weapon with Hydra-Shok ammunition. Ammunition that not only expands when it hits flesh and blood and body fluids, but ammunition that has got a special core to keep it on path. And, ladies and gentlemen, you look at those pants. The bloodstained pants. Why are they in evidence?

dant argues that this description of the ammunition "was not supported by the testimony, has no scientific basis and was improperly intended to appeal to the jury's sympathies." The defendant also argues that the prosecutor's "language was excessive, inflammatory and unsupported."[11]

The defendant concedes that he did not object at trial to those allegedly improper comments. He seeks review of his claim pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40.[12] We review the claim because the record is adequate to do so, and an allegation of prosecutorial misconduct in violation of the defendant's fundamental right to a fair trial is of constitutional magnitude. *State* v. *Whipper*, 258 Conn. 229, 272, 780 A.2d 53 (2001). We conclude, however, that the defendant's claim fails under *Golding*'s third prong because the challenged remarks did not deprive him of a fair trial.

"Prosecutorial misconduct can occur in the course of closing argument. . . . Our standard of review of a claim of prosecutorial misconduct that allegedly results in an unfair trial is well established. [T]o deprive the

Because . . . when Larry Mayes was facing the defendant, what part of his anatomy would have been blown away with those flesh tearing, ripping, totally destructive killer bullets?"

Also, during the sentencing hearing, the prosecutor referred to the fact that the defendant had used "killer bullets." Having been made outside of the jury's presence, after the jury had found the defendant guilty, that remark could not have affected the jury's verdict.

[11] Simultaneously, the defendant states that "[t]his was not a clear misstatement of the testimony or evidence. This was not a misstatement of a legal principle. Those errors a competent defense counsel would be presumed to notice and to challenge if prejudicial. Here, the error depends on understanding the ballistics of hollow point ammunition and knowing that such ammunition is legally sold in Connecticut and commonly issued to law enforcement officers."

[12] See footnote 3. In the alternative, the defendant seeks plain error review of his claim pursuant to Practice Book § 60-5. Given our resolution of his claim under *Golding*, we conclude that plain error review is not warranted.

defendant of his constitutional right to a fair trial . . . the prosecutor's conduct must have so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . We do not focus alone, however, on the conduct of the prosecutor. The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct. . . . Moreover, [w]e will not afford *Golding* review to [unpreserved] claims of prosecutorial misconduct where the record does not disclose a pattern of misconduct pervasive throughout the trial or conduct that was so blatantly egregious that it infringed on the defendant's right to a fair trial. . . .

"In determining whether the defendant was denied a fair trial we must view the prosecutor's comments in the context of the entire trial. . . . In examining the prosecutor's argument we must distinguish between those comments whose effects may be removed by appropriate instructions . . . and those which are flagrant and therefore deny the accused a fair trial. . . . The defendant bears the burden of proving that the prosecutor's statements were improper in that they were prejudicial and deprived him of a fair trial. . . . In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Jefferson*, 67 Conn. App. 249, 266–67, 786 A.2d

1189 (2001), cert. denied, 259 Conn. 918, 791 A.2d 566 (2002).

The defendant claims that the prosecutor improperly based her argument on facts not in evidence and appealed to the jury's emotions. The rule against appealing to the jury's emotions, passions or prejudices is firmly established. Closing argument affords the prosecutor a forum to comment fairly on the evidence adduced at trial. "An appeal to emotions, passions, or prejudices improperly diverts the jury's attention away from the facts and makes it more difficult for it to decide the case on the evidence in the record." *State* v. *Alexander*, 254 Conn. 290, 307, 755 A.2d 868 (2000).

"[I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must me allowed for the zeal of counsel in the heat of argument. . . . Inherent in this latitude is the freedom to argue reasonable inferences based on the evidence. . . . However, in fulfilling his duties, the prosecutor must confine the arguments to the evidence in the record. . . . Statements as to facts that have not been proven amount to unsworn testimony that is not the subject of proper closing argument." (Citation omitted; internal quotation marks omitted.) *State* v. *Conde*, 67 Conn. App. 474, 501, 787 A.2d 571 (2001), cert. denied, 259 Conn. 927, 793 A.2d 251 (2002). Likewise, a prosecutor is prohibited from asserting her "personal knowledge of the facts in issue, except when testifying as a witness. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument." (Citation omitted; internal quotation marks omitted.) *State* v. *Williams*, 41 Conn. App. 180, 185, 674 A.2d 1372, cert. denied, 237 Conn. 925, 677 A.2d 950 (1996). Mindful of those principles, we first analyze the remarks to determine if they were improper

and if they rose to the level of prosecutorial misconduct. If they did, we shall analyze the remarks to determine if they deprived the defendant of a fair trial.

It was undisputed at trial that the perpetrator of the shooting used a unique type of ammunition, namely, nine millimeter Federal Hydra-Shok jacketed hollow point bullets. At trial, Harold Wayne Carver, a forensic pathologist and the chief medical examiner for the state of Connecticut, testified about the hollow point bullet that he recovered from Mayes' leg. Carver testified that this type of bullet is "a bullet in which the nose of the bullet is . . . scooped out. It sort of has like a little dish in it. They are designed to change their shape to get bigger when they hit something. And the whole purpose of the bullets is to put energy into tissue and thereby destroy tissue. . . . [I]f the bullet is bigger, it touches more tissue and is more efficient at depositing its energy in the tissue. Therefore, it's supposed to do a better job." Carver further explained that this variety of bullet is designed to do more damage by hurting more body tissue.

Edward Jachimowicz, an expert firearms and tool mark examiner who works in the forensic science laboratory for the state, also testified about the bullets used in the shooting. Jachimowicz testified that the bullets were "copper jacketed, hollow point. Inside the bullet, or, inside the cavity of the hollow point, there's a post. The design of the bullet is that when fluid, whether it's water or body fluids or whatever, but when a fluid gets into the nose of that bullet, the water pressure or the hydraulic pressure causes the nose of that bullet to mushroom. And the post then sticks out and basically steers the bullet on a truer, straighter path."

John Brunetti, a detective with the West Haven police department who investigated the shooting, also testified about the bullets used in the shooting. Brunetti testified

that he observed a spent bullet in the ground and that it had "mushroomed." He therefore suspected that it was a hollow point type bullet.

Having reviewed the testimony concerning the bullets used in the attack, we are unable to conclude that the prosecutor's remarks were unsupported by the evidence adduced at trial. The state's experts testified that the bullets were designed to expand when they entered the body so as to maximize their ability to destroy body tissue. The evidence further demonstrated that the bullets used in the shooting fulfilled that purpose. In light of that evidence, the prosecutor's remark that the bullets were "flesh ripping" was not inaccurate and, therefore, not inappropriate. Furthermore, the prosecutor's reference to the bullets as "killer bullets" was likewise not inaccurate. The evidence reflects that the use of hollow point bullets in the shooting caused Mayes' death. The prosecutor may comment on the evidence and on the reasonable inferences that the jurors might draw from such evidence. *State* v. *Payne*, 260 Conn. 446, 454, 797 A.2d 1088 (2002).[13]

When viewed in isolation, the prosecutor's remarks might appear inflammatory or intended solely to arouse

[13] The defendant's appellate counsel devotes a significant portion of her principal brief to arguing that the state's expert testimony concerning hollow point bullets, as well as the prosecutor's arguments based on that testimony, was inaccurate. Appellate counsel supports her argument by citing to, among other things, various scholarly articles, information provided by the bullet's manufacturer and her own unsupported assertions concerning such bullets and their use. The defendant did not adduce any such evidence during trial. That information is not part of the record and has no place in the defendant's brief or in our consideration of the issue. We are bound to consider whether the prosecutor's argument was improper in light of the *evidence adduced at trial* from competent witnesses. In conducting that analysis, we have no need to resort to matters extraneous to the formal record. *Grunschlag* v. *Ethel Walker School, Inc.*, 189 Conn. 316, 320, 455 A.2d 1332 (1983).

We also reject, without further comment, the defendant's call to use our supervisory power to "punish the prosecutor" for commenting on or adducing scientific evidence that was inaccurate.

the passions of the jury. When viewed in the context of the evidence adduced during trial, however, the remarks constituted fair and zealous comment on the evidence. Having concluded that the prosecutor's remarks did not rise to the level of prosecutorial misconduct, we have no need to consider whether they deprived the defendant of his right to a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.