## STATE OF CONNECTICUT *v.* LUIS NORBERTO MARTINEZ
## (AC 26180)

Flynn, C. J., and Bishop and Foti, Js.

Argued October 10, 2007—officially released March 25, 2008

*Annacarina Del Mastro*, senior assistant public defender, for the appellant (defendant).

*Jessica Probolus*, special deputy assistant state's attorney, with whom, on the brief, were *James E. Thomas*, former state's attorney, and *Anne F. Mahoney*, senior assistant state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, Luis Norberto Martinez, appeals from the judgment of conviction, rendered after a jury trial, of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A), sexual assault in the first degree (alleging penile penetration) in violation of General Statutes § 53a-70 (a) (1), sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1) and risk of injury to a child in violation

of General Statutes § 53-21 (a) (2).[1] On appeal, the defendant claims that the trial court improperly precluded him from questioning the alleged victim about two prior incidents in which she claimed that she was sexually assaulted without first holding a hearing to determine the relevance of that evidence to his claims as to her credibility.[2] We agree with the defendant and therefore reverse the judgment of the trial court and remand the matter for a new trial.

On February 13, 2002, the alleged victim, J,[3] was thirteen years old and lived on the second floor of a multifamily house with her mother and two sisters. The defendant, who was twenty-one years old, lived with his mother on the third floor of the same house. On the evening of February 13, 2002, J walked by herself across the street to a store to purchase a sticker. When J came back from the store, she saw the defendant in front of her apartment. J testified that the defendant then grabbed her by the arm and took her to the back of the house, where he proceeded to force his hands inside her pants, touch her buttocks and put his fingers inside her vagina. He then grabbed her arm and took her up the back stairs to his apartment. The defendant took J to a bedroom, pushed her on the bed, pulled

---

[1] The trial court, *Espinosa*, J., declared a mistrial as to a second count of sexual assault in the first degree (alleging digital penetration) in violation of § 53a-70 (a) (1) after the jury could not reach a unanimous verdict on this count. On November 19, 2004, the defendant was sentenced to a total effective term of twenty-five years imprisonment, execution suspended after twenty years, followed by five years of probation.

[2] The defendant also claims that the court denied his request for a state funded DNA expert without holding an indigency hearing. Because the first issue is dispositive of this appeal and because the defendant has not persuaded us that this issue is likely to arise during a retrial, we need not resolve this second issue.

[3] In accordance with our policy of protecting the privacy interests of the alleged victims of sexual abuse, we decline to identify the alleged victim or others through whom the alleged victim's identity may be ascertained. See General Statutes § 54-86e.

down her pants and forced his penis into her vagina. The bedroom door was partially open, so J was able to see the defendant's sister in the living room.

When the defendant was finished with J, he pulled her into the bathroom where he covered her mouth and told her not to scream. At that point, the defendant's sister knocked on the door to tell the defendant that he had a telephone call. The defendant then rushed J out of the apartment through the back door. J ran down the stairs with the defendant behind her. The defendant ran across the street to his sister's apartment. When J arrived at the front of the house, she ran upstairs to her apartment and immediately disclosed to her mother what had happened. Soon thereafter, J was taken to a hospital where physicians examined her and performed a sexual assault examination.

The defendant was arrested on the night of the sexual assault. With regard to his conduct at the time of J's assault, the defendant told the police that he had been in his mother's bedroom using drugs when his sister walked into the apartment. He then stated that he ran to the bathroom, flushed the drugs down the toilet and left the apartment by way of the back stairs so his sister would not see him high on drugs. He claims, therefore, that the encounter with the victim never occurred. Additional facts will be set forth as necessary.

The defendant claims that the court improperly refused to hold an evidentiary hearing for the purpose of allowing him to question J about two prior complaints of sexual abuse. We agree.

The following facts and procedural history are relevant to our disposition of the defendant's claim. The state filed a motion in limine seeking to preclude the defendant from offering into evidence J's prior sexual conduct. The defendant presented evidence that, prior to the incident in question, J had accused both her

stepuncle and her brother of sexually assaulting her in
two different incidents. Both men pleaded guilty.[4] The
defendant then filed an objection to the motion in limine
and requested a hearing on whether he should be per-
mitted to question J under one of the exceptions to
the rape shield statute, General Statutes § 54-86f.[5] The
defendant argued that the evidence was relevant to two
issues: J's credibility and whether the defendant used
force in kidnapping and sexually assaulting her.[6] As
part of his offer of proof, the defendant presented to
the court two police reports based on complaints filed
by J.[7] One police report concerned the incident with

[4] J's stepuncle pleaded guilty to a sexual assault charge, while J's brother
pleaded guilty to risk of injury to a child.

[5] General Statutes § 54-86f provides in relevant part: "In any prosecution
for sexual assault under sections 53a-70, 53a-70a, and 53a-71 to 53a-73a,
inclusive, no evidence of the sexual conduct of the victim may be admissible
unless such evidence is (1) offered by the defendant on the issue of whether
the defendant was, with respect to the victim, the source of semen, disease,
pregnancy or injury, or (2) offered by the defendant on the issue of credibility
of the victim, provided the victim has testified on direct examination as to
his or her sexual conduct, or (3) any evidence of sexual conduct with the
defendant offered by the defendant on the issue of consent by the victim,
when consent is raised as a defense by the defendant, or (4) otherwise so
relevant and material to a critical issue in the case that excluding it would
violate the defendant's constitutional rights. Such evidence shall be admissi-
ble only after a hearing on a motion to offer such evidence containing an
offer of proof. . . ."

[6] The use of force is an element of two of the crimes with which the
defendant was charged. The defendant was charged with sexual assault in
the first degree in violation of § 53a-70 (a), which provides in relevant part:
"A person is guilty of sexual assault in the first degree when such person
(1) compels another person to engage in sexual intercourse by the use of
force against such other person or a third person, or by the threat of use
of force against such other person or against a third person which reasonably
causes such person to fear physical injury to such person or a third per-
son . . . ."

The defendant was also charged with kidnapping in the first degree in
violation of § 53a-92 (a), which provides in relevant part: "A person is guilty
of kidnapping in the first degree when he abducts another person and . . .
(2) he restrains the person abducted with intent to (A) inflict physical injury
upon him or violate or abuse him sexually . . . ."

[7] These police reports are marked in the file as court's sealed exhibits I
and II.

J's brother, and the other involved the incident with J's stepuncle. In addition to offering the police reports, the defendant also argued that he should be allowed to question J about falsely reporting that her brother had forced her against her will to have sex. The defendant cited the police reports for his assertion that J may have made false accusations against her brother. First, he noted that in the police report regarding the sexual assault by J's brother, J's sister, M, had stated that this was the second time that she had observed J having sex with their brother. On a previous occasion, M had observed J having sex with her brother on his bed. With regard to the incident at issue in the police report, M stated that she had been watching television when the brother had come into the room to tell her that J wanted him to shower with her. M stated that a few minutes later, she opened the bathroom door and observed J and her brother having sex in the shower. In contrast, J had reported to the police that when she got out of the shower, her brother came into the bathroom and began to touch her "private parts" inappropriately. She stated that she attempted to get away, but her brother pulled her by the hand into his bedroom, closed the door, put J on the floor and began having sex with her.

The defendant also noted that in the police report regarding the incident with J's stepuncle, a police officer stated that a social worker had told him that J began to change her story about her brother's having sexually assaulted her. The officer stated that J had told the social worker that, in fact, it was her stepuncle who actually had touched her inappropriately. The defendant argued that this statement by J to the social worker coupled with M's account of the incident with J's brother served to call J's credibility into question. The defendant wanted to question J about what she told the police regarding the incident with her brother and

about whether she changed her story regarding that incident.

The court found that the prior incidents of sexual assault were not relevant. The court, therefore, limited the defendant's cross-examination of J to asking her whether she ever had made a false report regarding sexual assault. In addition, the court found that the incidents were protected by the rape shield statute and that, even if the prior incidents were relevant, their probative value did not outweigh their prejudicial impact. The defendant renewed his objection on the following day on the basis of *State* v. *DeJesus*, 270 Conn. 826, 841, 856 A.2d 345 (2004). He stated that the prior incidents were relevant to J's credibility regarding the element of force and to whether the assault occurred at all. The court refused to change its ruling. The court did state, however, that the defendant's defense, at this point, was that he did not commit the assault but that if the scope of the defense changed later on in the trial, the court would reconsider its ruling.[8]

[8] In making its ruling on the admissibility of the alleged victim's testimony regarding prior incidents of sexual conduct, the court repeatedly presumed that the defendant's defense was that he did not perform the acts with which he was charged. The defense attorney, however, noted that the defendant had not presented a defense at that point. Furthermore, he stated that the defendant was "allowed to visit alternative defenses." The defense attorney argued that the defendant could present the defense that the defendant did not commit the sexual assault but also assert that if he did commit the sexual assault, then the alleged victim consented to the acts. Although the alleged victim's consent would not be a defense for the defendant, as she was only thirteen years old at the time the event occurred; see General Statutes § 53-21; her consent would negate the element of force, which the state had to prove for the crimes of sexual assault in the first degree and kidnapping in the first degree. See footnote 6 of this opinion. Our courts have recognized a defendant's right to present alternative, and even inconsistent, defenses at trial. See *State* v. *Miller*, 55 Conn. App. 298, 301, 739 A.2d 1264 (1999) ("[a] defendant is permitted to present inconsistent defenses to a jury"), cert. denied, 252 Conn. 923, 747 A.2d 519 (2000). Although the defendant had not presented a defense of consent prior to the court's making its ruling here, he still had a right to develop that defense of consent.

As a preliminary matter, we set forth the legal principles that guide our resolution of the defendant's claim. "[A] determination that a defendant is entitled to an evidentiary hearing involving the victim's testimony is . . . subject to the discretion of the trial court." *State v. Manini*, 38 Conn. App. 100, 111, 659 A.2d 196, cert. denied, 234 Conn. 920, 661 A.2d 99 (1995). "In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the trial court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) Id., 112.

"For a defendant to introduce evidence of a victim's prior sexual conduct, the proffered evidence must fall into one of the four delineated exceptions provided by the rape shield statute. The evidence is admissible only after a hearing on a motion to offer such evidence containing an offer of proof." Id., 106. In *Manini*, the court concluded that "§ 54-86f requires a defendant to make a preliminary showing that the evidence sought to be explored in the evidentiary hearing is relevant. The showing must be sufficient to enable the trial court to make an informed ruling in connection with the exercise of its discretion on the issue. That showing must be made as part of the offer of proof as a prerequisite to obtaining an evidentiary hearing to determine the admissibility of evidence of the victim's prior sexual conduct." Id., 114.

"The defendant bears the burden of establishing the relevance of the proffered testimony." *State v. Sullivan*, 244 Conn. 640, 648, 712 A.2d 919 (1998). "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence. . . . To be

relevant, the evidence need not exclude all other possibilities; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree." (Citations omitted; internal quotation marks omitted.) *State* v. *Cerreta*, 260 Conn. 251, 261–62, 796 A.2d 1176 (2002).

In the present case, the defendant offered two police reports as part of his offer of proof as to why J's past sexual conduct was relevant. Specifically, the defendant pointed out two things from the police reports. First, he noted that J's sister, M, had stated that this was the second time she had observed J having sex with her brother. Additionally, M stated that with regard to the incident with J's brother, J's brother had told M that J wanted her brother to shower with her, thereby implying the act of sex between J and her brother may have been consensual. Second, the defendant noted that the police officer writing the report had been told by a social worker interviewing J that after J made her initial complaint, she had changed her story regarding her brother.[9] Finally, the defendant stated that in the police report regarding the incident with J's brother, J had stated that her brother had used force to coerce her into having sex with him. Similarly, in the present situation involving the defendant, J had claimed that

---

[9] The dissent states that the offer of proof submitted by the defendant, in the form of the two police reports, contained double and triple hearsay. It should be noted that if the alleged victim had been allowed to testify concerning her prior sexual conduct, her testimony would not constitute hearsay. See *National Publishing Co.* v. *Hartford Fire Ins. Co.*, 94 Conn. App. 234, 253, 892 A.2d 261, cert. granted on other grounds, 278 Conn. 903, 896 A.2d 105 (2006); *State* v. *L'Minggio*, 71 Conn. App. 656, 668, 803 A.2d 408, cert. denied, 262 Conn. 902, 810 A.2d 270 (2002). The alleged victim's testimony regarding both her account of the sexual conduct involving her brother and her version of how and why she changed her story regarding the incident with her brother would be a firsthand account of the events subject to cross-examination. Therefore, the court properly relied on the police reports presented by the defendant in deciding whether to allow him to cross-examine the alleged victim regarding her prior sexual conduct.

the defendant had used force in sexually assaulting her. Therefore, the defendant argued, J's prior sexual conduct was relevant to both J's credibility and to whether the defendant had used force, if he had committed the sexual assault at all.

We agree with the defendant in part. After an examination of the record, we conclude that the police reports provided sufficient proof for the court to be able to determine that J's prior sexual conduct was relevant to whether the defendant had used force in sexually assaulting J. If the defendant had been able to establish that J's brother did not use force, he might have been able to cast reasonable doubt as to whether the defendant had used force in having sex with J. Because we conclude that J's prior sexual conduct was relevant to whether the defendant used force in committing the sexual assault, we do not need to address whether it was relevant to J's credibility, as the defendant argues.

We conclude that the defendant's offer of proof satisfied the requirement of demonstrating a sufficient basis for the court to decide whether to allow the defendant to present J's testimony in an evidentiary hearing under § 54-86f. Specifically, the defendant presented facts that tended to demonstrate the falsity of J's prior allegations. Cf. *State* v. *Smith*, 85 Conn. App. 96, 105, 856 A.2d 466 (2004), aff'd, 280 Conn. 285, 907 A.2d 73 (2006). Therefore, the court abused its discretion in refusing to grant the defendant an evidentiary hearing to determine the admissibility of evidence of J's prior sexual conduct.

The defendant offered evidence that would have been admissible under subdivision (4) (element of force) of § 54-86f. "The improper exclusion of evidence admissible under § 54-86f (4) is, necessarily, of constitutional magnitude because the statutory subdivision defines the standard of admissibility in terms of the exclusion

of the evidence resulting in a violation of the defendant's constitutional rights.

"Normally, even when an evidentiary ruling has been determined to be both improper and of constitutional magnitude, the ruling will be reversed only if the state fails to prove beyond a reasonable doubt that the ruling was harmless to the defendant. . . . [H]owever . . . an evidentiary ruling that excludes evidence properly admissible under § 54-86f (4), contrary to evidence admissible under the other subdivisions of the statute, requires reversal with no additional evaluation of harm, because the establishment of materiality, in a constitutional sense, also establishes harm to the defendant. Thus, analysis of whether the state has proved beyond a reasonable doubt that the ruling was harmless to the defendant would only replicate the analysis already completed under the statute." (Citation omitted.) *State v. DeJesus*, supra, 270 Conn. 845.

The defendant claimed that the court improperly precluded evidence that was "relevant and material to a critical issue in the case, namely, whether the defendant kidnapped and had sex with the minor victim while using force." This evidence would have been admissible under § 54-86f (4) as evidence that was "so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights. . . ." General Statutes § 54-86f (4). Because the court precluded evidence properly admissible under § 54-86f (4), harm to the defendant was automatically established due to the materiality of the evidence not admitted. Therefore, a new trial is warranted.

The judgment is reversed and the case is remanded for a new trial.

In this opinion FLYNN, C. J., concurred.

BISHOP, J., dissenting. In 1982, the General Assembly enacted General Statutes § 54-86f, the rape shield statute. Speaking for the bill, Representative Rosalind Berman commented: "The primary purpose of this bill is to spare sexual assault victims from a second traumatic victimization of trial. Victims of sexual assault have suffered enough and yet today our criminal justice system encourages degrading and unwarranted probes into a victim's private life . . . [w]hich results in non-reporting and failure to prosecute and these have been the big obstacles in getting people to report the crime and to be willing to prosecute." 25 H.R. Proc., Pt. 11, 1982 Sess., pp. 3533–34.

Our courts have embraced the salutary purposes of the rape shield statute. The Supreme Court has noted: "The rape shield statute excludes evidence of prior sexual conduct of the victim of a sexual assault, unless one of the statutory exceptions is satisfied. . . . The statute was enacted specifically to bar or limit the use of prior sexual conduct of an alleged victim of a sexual assault . . . . Our legislature has determined that, except in specific instances, and taking the defendant's constitutional rights into account, evidence of prior sexual conduct is to be excluded for policy purposes. Some of these policies include protecting the victim's sexual privacy and shielding her from undue harassment, encouraging reports of sexual assault, and enabling the victim to testify in court with less fear of embarrassment. . . . Other policies promoted by the law include avoiding prejudice to the victim, jury confusion and waste of time on collateral matters." (Citations omitted; internal quotation marks omitted.) *State* v. *Christiano*, 228 Conn. 456, 469–70, 637 A.2d 382, cert. denied, 513 U.S. 821, 115 S. Ct. 83, 130 L. Ed. 2d 36 (1994). Thus, the rape shield statute prohibits inquiring into a sexual assault victim's sexual conduct unless the proposed inquiry fits within one of the act's exceptions.

In pertinent part, the rape shield statute provides: "In any prosecution for sexual assault . . . no evidence of the sexual conduct of the victim may be admissible unless such evidence is . . . (4) otherwise so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights. Such evidence shall be admissible only after a hearing on a motion to offer such evidence containing an offer of proof. . . ." General Statutes § 54-86f. The majority concludes that the defendant, Luis Norberto Martinez, made a sufficient offer of proof of evidence that was so relevant and material to a critical issue in the case that, by excluding it, the defendant was denied constitutional rights. Assessment of this finding requires careful review of the defendant's proffer to determine whether it constituted an offer of proof and, if so, whether the "evidence" the defendant intended to adduce fit into the parameters of this exception to the statute's proscriptions.

Finding, in this instance, that the defendant's proffer fit within the statute's catchall exception regarding relevant and material evidence necessary to protect a defendant's constitutional rights, the majority faults the trial court for preventing the defendant from examining the victim regarding two prior sexual assaults perpetrated on her. Because, in my view, the court afforded this victim the protection intended by the rape shield statute without infringing on the defendant's constitutional rights, I respectfully disagree with my colleagues in the majority.

The following procedural history is relevant to an analysis of whether the defendant ever made an offer of proof, and, if so, whether it constituted evidence admissible pursuant to the rape shield statute. The rape shield issue was first raised in this matter by the state through a pretrial motion filed September 1, 2004, captioned, "State's Motion in Limine to Exclude Evidence

of Victim's Prior Sexual Conduct."[1] In response, the defendant filed an objection dated September 3, 2004, in which he asserted that he had a good faith basis on which to examine the victim regarding her sexual conduct. This issue was taken up by the court on September 7, 2004, after the jury had been selected and before the commencement of evidence. My close scrutiny of the ensuing discussion between the court and counsel fails to reveal that the defendant made any offer of proof during this proceeding, let alone an offer of relevant and material evidence.

At the outset of the discussion, defense counsel stated: "And I filed my objection, Your Honor. I indicated that it is offered by the defendant, the issue of the credibility of the victim. The victim is expected to testify on direct examination as to her sexual conduct. And also, it's relevant and material to a critical issue in the case, which is whether the defendant kidnapped and had sex with a minor victim while using force. And we have a good faith belief and based upon some family members and—because they live in the same building, they know that there have been prior incidents with the minor girl, including prior incidents that resulted in arrests and prosecution of people. And we believe that that's relevant to the issue of her credibility and to the issue of whether . . . what she's alleging about [the defendant] actually took place." When the court asked counsel what information he had that the victim had made prior false claims, counsel replied: "We don't know exactly whether there's force claims. Now, there have been claims. And we have information and making that representation upon information and belief that

---

[1] I note that while it is ironic, if not offensive, to refer to prior sexual assaults upon this young victim as past "sexual conduct," it appears, nevertheless, that for purposes of the rape shield statute, this court and our Supreme Court have included past allegations of sexual assault as covered by the statute. See State v. Sullivan, 244 Conn. 640, 712 A.2d 919 (1998).

she had prior claims. And I think the state should have that information, I think, that is in any way inculpatory. That's why I'm asking for a hearing, that it be presented to the court and the court decides whether that might be relevant or not. Because some prior—prior sexual history that included situations where people were—my understanding is a family member also was arrested."

The record reveals that on several occasions the court questioned defense counsel about whether he was claiming that any prior allegations of sexual assault by the victim were false, and the following discussion ensued:

"[Defense Counsel]: Well, sexual history. The same type of allegation that happened here.

"The Court: That she made a false claim?

"[Defense Counsel]: Somebody having sex with her and then she—yeah, yes. And then she complained. And the person was arrested and, you know, went through the same process. And, again, I'm making these assertions upon information and belief based upon what the family who lived there in the same building and they were neighbors for quite a while indicated."

Following this exchange, the prosecutor indicated that there were two prior cases in which the victim had made complaints that were sustained, that the defendants in those cases were successfully prosecuted and that each defendant made admissions, pleaded guilty and was incarcerated. In response, the court asked defense counsel, "So, they weren't false claims, they were true claims." Counsel responded, "Well, we don't know. People [pleaded] guilty. So, we don't know. And that's why we . . . we want to have a hearing." Thereafter, the prosecutor stated: "I'll make an offer to the

court as an officer of the court that one was an *Alford*[2] plea, but he—he made admissions to the police officers when he was arrested. The other—I think the other one may have been *Alford* as well, but that was a full confession. So, I think they recognized the strength of the state's case. And each of those, they received jail time and probation in which they're going to have to make admissions. The *Alford*, I don't know if it was to any specific part of the facts. I don't have the transcripts in front of me. But I think that what counsel suggests, then, is that he should be allowed to ask this victim or anybody else about that is—we're going to end up with a trial within a trial. Those people have already pled guilty. The victim—her credibility has already been sustained by the court."

Following a brief colloquy concerning the import of guilty pleas in the two prior cases in which defense counsel claimed that the pleas do not prove that the victim was telling the truth and in which the court commented that the findings did not show the victim's statements to be false, defense counsel commented: "But I think in order for—in order for the court to protect the rights of [the defendant], and to protect the victim, I think we should be allowed to have a hearing and see what happens, see the evidence." When asked what kind of a hearing he sought, counsel indicated: "Well, the type of hearing that—that they—they mention in *State* v. *Manini*, [38 Conn. App. 100, 110, 659 A.2d 196, cert. denied, 234 Conn. 920, 661 A.2d 99 (1995)]. And I don't have a copy of that case now because I couldn't stop by my office. But it's—but it's the type of hearing that they mention specifically in this type of situation under the statutes." The following colloquy then took place:

---

[2] See *North Carolina* v. *Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970). An *Alford* plea allows a defendant to enter a plea containing protestations of innocence while voluntarily, knowingly and understandingly consenting to the imposition of a prison sentence.

"The Court: But there is no evidence that she made false statements.

"[Defense Counsel]: Well, there's no evidence she made true statements, either.

"The Court: Well—

"[Defense Counsel]: We have—we have some allegations, and people have [pleaded] guilty.

"The Court: The question is not—the question is whether she made false statements. That's what—

"[Defense Counsel]: Well, because it goes to her credibility, and it goes to whether—I mean, a person makes one, two, three; hey, there's smoke—if there's smoke, there's fire."

Later, in concluding this portion of the dialogue, the following exchange ensued:

"The Court: Well, that's—it's still a conviction. And that does not make it untrue. In fact, the fact that the people [pleaded] guilty, whether it's under the *Alford* doctrine or not, there was a [finding] of guilty. There was no proof that her allegations were false; to the contrary, apparently, they were correct.

"[Defense Counsel]: Yeah, but if—well, we are making that assumption, Your Honor, but if we don't have a hearing here to look at—to actually what happened.

"The Court: Well, what kind of hearing do you want. You want to put—who do you want to call in this hearing?

"[Defense Counsel]: Maybe her, get the records, get all the information."

When asked what he would ask the victim, counsel responded: "Well, we would ask her about the incident, and exactly the pattern, looking at the police report,

looking at the people. Who knows? We might—we might—I might call a witness. I might—but we should have a hearing."

Following this discussion, counsel for the defendant indicated that he had not seen the arrest warrant applications or the transcripts of the pleas associated with them, and he commented further on his request for a hearing:

"[Defense Counsel]: No, I haven't seen the transcripts of the pleas. They were made available to me, and I look at them and I might—that's why—that's why—all what I have is basically, you know—and if we have a hearing, probably going to have to call some of the family members, some of the people that know, some of the people that have had contact with some of the people that allegedly committed the crimes. We have some information."

In response to the court's question of why that would not be hearsay, counsel indicated: "Well, because this— it's not, it's not going to be a trial. It's going to be a hearing to decide—you know, to decide whether I could go into questioning her about the past." To this statement, the court replied: "Yeah, but you have to make a showing that you're going to question her about relevant information. This is not going to be a fishing expedition here to try to see if you can find something that you can use. The record as it stands today is that she was— there were two other cases, and they both [pleaded] guilty. That's not the same as saying, well, she made false allegations." The following colloquy then took place:

"[Defense Counsel]: Well, it's not the same, Your Honor, but it's a pattern here. There's a third person that—

"The Court: What's the pattern?

"[Defense Counsel]: Well, it's a pattern of, you know, somebody assaulted me. You know, and—the third time in two years, I think.

"The Court: Well, how would that affect her credibility?

"[Defense Counsel]: Less than three years. Huh?

"The Court: How does that affect her credibility?

"[Defense Counsel]: Well, excuse me. Yeah, and how—Your Honor, I think it affects her credibility in many ways. I mean, we have to—we have to—we have to look into somebody that, I mean, does the same thing three times.

"The Court: She—what did she do?

"[Defense Counsel]: Well, again, our—claim the same thing three times. Same thing. I was assaulted and had somebody arrested. I was assaulted sexually, somebody was arrested. And I was assaulted sexually and somebody arrested.

"The Court: And they were convicted.

"[Defense Counsel]: It's—

"The Court: And they were convicted twice. What's the falsehood?

"[Defense Counsel]: Well, Your Honor, again they were convicted under the *Alford* plea. They deny that they did it.

"The Court: Well, that's not relevant. It was a conviction. From what you've told me, there was no—you've given me nothing to support a claim of falsehood, which is the issue.

"[Defense Counsel]: See, Your Honor, it means that—

"The Court: For the contrary.

"[Defense Counsel]:—if she accused somebody and the person's not vindicated, then that—that's basically why if I see reasoning that somebody—if she . . . accused [somebody], and the person was not convicted—

"The Court: No. If she accused somebody, and it was determined to be false, that's a different story. But here, apparently, she was assaulted, and it was—there was a vindication. Twice. There was no evidence of any falsehood on her part.

"[Defense Counsel]: What about a pattern, Your Honor?

"The Court: A pattern of what?

"[Defense Counsel]: A pattern of—

"The Court: Being assaulted?

"[Defense Counsel]:—of assault.

"The Court: The fact that she was assaulted twice?

"[Defense Counsel]: Assault and charge—assault and then charges.

"The Court: And then convictions.

"[Defense Counsel]: Assault and then making a complaint.

"The Court: And then conviction. Where's the falsehood?

"[Defense Counsel]: But it is at least, Your Honor, probably—it goes—even if it isn't false—false—and I withdraw that. But assuming for a second that we don't know whether it's true or false, we only know that some people were convicted, some people were convicted under the *Alford* doctrine, that they say, they deny it. So, there's no way of knowing whether it happened or not.

"The Court: Why do they have to admit it to show that it's false—to show that it's not false?

"[Defense Counsel]: Well, we won't know whether it was false or not. That's the problem.

"The Court: Exactly. So, unless you can say it was false, you don't get to ask her about it.

"[Defense Counsel]: Well, if we don't get—so, I don't even get to ask in the hearing—I mean, I'm not talking in front of [the] jury. I mean, in the hearing, have a hearing, an evidentiary hearing, some sort of hearing, the hearing that I call upon her to see—

"The Court: Unless you can—unless you have a good faith basis to establish that it was false, no. You don't have the opportunity just to ask her questions about her sex life without making the appropriate showing."

After the court gave the prosecutor an opportunity to respond to defense counsel's comments, the court asked the prosecutor to provide defense counsel copies of the arrest warrant affidavits in both prior cases. The court concluded the hearing, indicating that it was reserving its decision on this issue.

This issue next arose on September 8, 2004, at the conclusion of the state's direct examination of the victim. In the absence of the jury, the court indicated to counsel that it had read the arrest warrant applications regarding the two prior incidents and asked the defendant, specifically, for his offer of proof. Counsel replied that his offer of proof was the arrest warrant applications from the two prior incidents, and he claimed that they demonstrated that the victim made false allegations against her brother as to one of the incidents. On that basis, counsel claimed that he should be entitled to question her about the two prior incidents. When asked what he wanted to ask the victim, counsel replied: "Well, I want to ask her about the prior—the prior

incidents." As to whether he wanted to ask the victim all the facts about the prior incidents, counsel responded: "Yeah, for her to describe it, and for her—for her basically to—to describe or to answer questions about whether she told the truth to the police and whether there were—this statement made by the sister, you know, that she had sex consensually, that was correct or not. And I also want to ask her about whether she changed her story at some point and when—whether she changed her story when she made the second arguments or whether what she's saying now is correct and what the two different—two different incidents and that they were mistaken."

Following additional colloquy between the court and both counsel, the court indicated: "Well, we're not going to litigate these two cases, that's for sure. It's not relevant—none of these are relevant. If you are—you can—I'm going to let you ask her if she ever gave—she ever accused anyone falsely of this before." Counsel responded, "And if she says no, may I inquire further?"

The following colloquy then ensued:

"The Court: No. Then you're done. What would you ask her then? We're not going to—you have to take her answer like she gives it. We're not going to litigate these two cases. Because there's no evidence that in fact any of these claims were false.

"[Defense Counsel]: Well, Your Honor, I think there is here. I think there's some indicia that there might have been some problems with the claim. That's my—my reading of the police report.

"The Court: Not in these—not in the reports. And they are only police reports. That's why I'm going to let you ask about any false accusations. And we're going to do that outside the presence of the jury."

Thereafter, before the jury was returned to the court-room, counsel was permitted to ask the victim whether she had ever made any report regarding a sexual assault on her person that was false, to which the victim replied, "No." When counsel then asked the victim how many sexual assault incidents she had reported to the police, the court sustained the prosecutor's objection on the ground that the question constituted a fishing expedition and stated: "We're not going to get into that. It's not relevant to the case. And it is protected by the rape shield statute." When asked if counsel could ask the victim about the two prior incidents specifically, the following ensued:

"The Court: No. Those are not—they're no—they're not relevant. They're not relevant to this case. And they are—the court finds that they are protected by the rape shield statute. They're not relevant. And if they are, the probative value does not outweigh the prejudice.

"[Defense Counsel]: So, therefore, Your Honor, I'm precluded from asking anything related to that area?

"The Court: Yes, that's it.

"[Defense Counsel]: So, that's the extent of my offer of proof here."

Thereafter, counsel for the defense cross-examined the victim following which he asked the court to revisit its rape shield ruling on the basis of *State* v. *DeJesus*, 270 Conn. 826, 856 A.2d 345 (2004), which had just been issued. Arguing that his cross-examination of the victim had uncovered a basis to further examine her credibility, counsel argued that the *DeJesus* opinion further buttressed his right to question the victim about the prior incidents. Distinguishing *DeJesus* from the facts at hand, the court disagreed. The defendant then reiterated his argument that the arrest warrant applications

cast sufficient doubt on the victim's credibility to warrant his examination of her. In response, the court commented: "Well, the police reports don't say exactly what you just related. There's a little gloss that you've put on it. But viewing the prior—the two prior cases when she was twelve years old and this case, they're not similar. They don't go to any issue that would override the rape shield statute that the court has seen so far in the record. Now, if later on something develops during the trial that would cause the court to reconsider, then the court would reconsider. But at this point, your defense is, I didn't do it. He wasn't there. And not that it was a consent. So, at this point, the court is not going to change its ruling." This concluded the discussion between the court and counsel regarding the rape shield statute.

On the basis of this record, I believe the trial court acted correctly and in accord with the dictates of the rape shield statute. I believe, respectfully, that contrary to established decisional precedent, the majority has failed to accord proper deference to the primacy of the trial court's ruling on this issue. Additionally, and contrary to the majority's conclusion, I do not believe the record reflects that the defendant ever made any offer of proof that entitled him to delve into an area protected by the rape shield statute.

In assessing a decision by a trial court regarding the exclusion of evidence, our review should be deferential. As recently noted by this court in an appeal concerning the rape shield statute: "Upon review of a trial court's decision, we will set aside an evidentiary ruling only when there has been a clear abuse of discretion. . . . The trial court has wide discretion in determining the relevancy of evidence and the scope of cross-examination and [e]very reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of

discretion." (Internal quotation marks omitted.) *State* v. *Cecil J.*, 99 Conn. App. 274, 279, 913 A.2d 505, cert. granted on other grounds, 282 Conn. 904, 920 A.2d 310 (2007). This court further opined: "A defendant who seeks to introduce evidence under one of the exceptions of § 54-86f must first make an offer of proof. General Statutes § 54-86f ([s]uch evidence shall be admissible only after a hearing on a motion to offer such evidence containing an offer of proof). Although a defendant may be entitled to an evidentiary hearing during which he may demonstrate that the evidence would be admissible under one of the exceptions to § 54-86f, such a hearing is required only if the trial court first determines that the evidence is relevant. . . .

"Determining whether evidence is relevant and material to critical issues in a case is an inherently fact-bound inquiry. . . . As a general principle, evidence is relevant if it has a tendency to establish the existence of a material fact. One fact is relevant to another fact whenever, according to the common course of events, the existence of the one, taken alone or in connection with other facts, renders the existence of the other either certain or more probable. . . . If the proffered evidence is not relevant, the defendant's right to confrontation is not affected, and the evidence is properly excluded." (Citations omitted; internal quotation marks omitted.) *State* v. *Cecil J.*, supra, 99 Conn. App. 280–81.

This court also has noted: "The rape shield statute is designed to restrict the admissibility of evidence of a sexual assault victim's prior sexual conduct, unless one of the statutory exceptions is satisfied. . . . The statute was enacted specifically to bar or limit the use of prior sexual conduct of an alleged victim of a sexual assault because it is such highly prejudicial material. . . . It reflects the modern understanding that a victim's prior sexual conduct is generally irrelevant." (Citations omitted; internal quotation marks omitted.) *State*

v. *Malon*, 96 Conn. App. 59, 73–74, 898 A.2d 843, cert.
denied, 280 Conn. 906, 907 A.2d 93 (2006). Also,
"[d]etermining whether evidence is relevant and mate-
rial to critical issues in a case is an inherently fact-
bound inquiry. Relevance depends on the issues that
must be resolved at trial, not on the particular crime
charged. . . . Consequently, the determination of
whether the state's interest in excluding evidence under
the rape shield statute must yield to the defendant's
sixth amendment rights to confront the witnesses
against him and to present a defense depends on the
facts and circumstances of the particular case." (Cita-
tions omitted; internal quotation marks omitted.) *State*
v. *DeJesus*, supra, 270 Conn. 837.

In the case at hand, although the majority has referred
to this deferential standard of review, it is not apparent
that my colleagues have accorded any deference to
the court's ruling that the defendant's proffer was not
relevant and material to a critical issue in the case as
the issues were then playing out at trial. The court was
in a superior position to assess the potential relevance
of this line of inquiry to the specific issues in this case.
Immediately before the court first heard argument on
the rape shield statute, the court heard from counsel
on the question of third party culpability. During this
argument, counsel indicated to the court that as to one
of the charges, he intended to present evidence that
the defendant was in another person's company. Addi-
tionally, the defendant had given the police a statement
denying that he had any sexual relations with the victim
and stating that during the time in which she claimed
he was sexually assaulting her, he was in an adjoining
bathroom flushing drugs down the toilet. Clearly, it
was the court's impression at the time it ruled on this
question that the defendant's principal defense in this
matter was that he did not engage in sexual relations
with the victim. Thus, even though defense counsel

properly pointed out to the court the duty of the state to prove each element of the offense beyond a reasonable doubt, it was the court's informed view that evidence of past assaults on the victim and any discrepancies in her claims in either of those cases bore no relevance to the critical issues in the case at hand. The court's stated willingness to revisit this issue should it become relevant as the trial progressed is strong evidence of the court's desire to make a fact based contextual ruling.[3] In finding that the court improperly prevented defense counsel from examining the victim regarding these past assaults, the majority fails to analyze precisely the basis on which the court's factual determination regarding relevance and materiality was faulty.

As noted, in order to be entitled to a hearing under § 54-86f, a defendant must make an offer of proof. My conclusion that the defendant failed to make any offer of proof is premised on the following: even if it can be assumed that the arrest warrant applications can be considered an offer of proof, they do not constitute evidence, as they consist of double and triple hearsay; the defendant made no specific offer of the testimony of any of the individuals named in either report; contrary to the majority's and the defendant's gloss regarding the arrest warrant applications, neither provides any evidence that the victim's allegations of being sexually assaulted in either prior case were false; and even if these reports could be said to raise a question regarding the victim's complete consistency in one of the prior instances, and if a mere question of consistency rather than an offer of proof of falsity could be found to be

---

[3] The state claims that the defendant abandoned this issue by not putting on any evidence suggestive of consent. I do not agree. Even though the court suggested that it would revisit the issue if subsequent trial proceedings made it relevant and material, I do not believe that counsel's failure to present evidence of consent should bar appellate review of the defendant's rape shield claim because, as he points out, the state retained the obligation to prove each and every element of the charged offenses.

a sufficient reason to conduct a hearing, the defendant provided no basis for the court to determine that any inconsistencies regarding the victim's claims in either of the prior two incidents were relevant and material to any critical issues in the case at hand. Because I believe that the defendant's request for a hearing was not premised on an offer of proof but was, rather, no more than a quest for a fishing expedition, the court properly denied the defendant's request to invade the victim's statutorily protected privacy.

"Offers of proof are allegations by the attorney . . . in which he represents to the court that he could prove them if granted an evidentiary hearing. . . . The purpose of an offer of proof has been well established by our courts. First, it informs the court of the legal theory under which the evidence is admissible. Second, it should inform the trial judge of the specific nature of the evidence so that the court can judge its admissibility. Third, it creates a record for appellate review." (Internal quotation marks omitted.) *State* v. *Payne*, 100 Conn. App. 13, 21 n.5, 917 A.2d 43, cert. denied, 282 Conn. 914, 924 A.2d 139 (2007). Additionally, an offer of proof "should contain specific evidence rather than vague assertions and sheer speculation . . . ." Id., 21; see also *State* v. *Bunker*, 89 Conn. App. 605, 628, 874 A.2d 301 (2005), appeal dismissed, 280 Conn. 512, 909 A.2d 521 (2006).

My review of the record in this case reveals that the defendant never offered any specific evidence, but rather made reference to two arrest warrant applications containing double and triple hearsay statements without providing the court any basis on which these arrest warrant applications could be made admissible, and he made a vague reference to the possibility of calling some unnamed witnesses with no indication of what any of them would state under oath. Moreover, even if we could assume that counsel's reference to

the arrest warrant applications constituted an offer of proof, counsel provided no basis for the court to determine whether the reports could be made admissible. Rather, it appears from the record that counsel simply wanted to use some of the allegations set forth in the arrest warrant applications as fodder for cross-examination of the victim. Indeed, defense counsel made it plain to the court that he considered these reports to be an adequate basis for an invasive examination of the victim. Because the arrest warrant applications were marked as court exhibits, they are available for our examination on review. Neither of them demonstrated that the victim had made any prior false complaints.

The first document is dated February 1, 2001, and pertains to a sexual assault on the victim by her brother on December 1, 2000, when he was seventeen years old and she was twelve. The report states that the victim reported that her brother had vaginal intercourse with her and that, upon questioning, her brother admitted that, while lying in bed with the victim, he had sex with her for "ten to twenty minutes." The report also provides details of a forensic examination of the victim at a hospital that revealed physical findings consistent with the victim's allegations. In discussing this offense, the prosecutor made a representation to the court that the victim's brother not only made the admission as noted, but that he pleaded guilty to risk of injury to a child for which he was found guilty and incarcerated.[4]

From my reading of this arrest warrant application, I do not find any instances of false allegations. To be

[4] It is, perhaps, noteworthy that because the victim was younger than age thirteen at the time of this offense, the brother's admission inculpated him for the crime of sexual assault in the first degree regardless of whether or not the victim was a "willing" participant because, at the age of twelve, she was legally incapable of consent. Our Supreme Court long ago opined that a twelve year old child is incapable of consenting to sexual relations; therefore, even if a twelve year old submits without resistance, the act is considered to be done by force. See *Mascolo* v. *Montesanto*, 61 Conn. 50, 56, 23 A. 714 (1891).

sure, the victim and her brother gave somewhat differ-ent versions of the same story. Each claimed that the other was the initiator. The report neither supports nor undercuts the claim of either that the other was the initiator. This document also contains a report that the victim's sister saw them having sex on two occasions. Because the victim was twelve years old at the time of this assault and therefore not capable of consenting to sexual intercourse with her seventeen year old brother, the report of the sister's observations, if accurate, sim-ply provides evidence that her brother sexually assaulted the victim on two occasions. The contents of the report did not constitute evidence of a prior false allegation, and this report was not relevant to any criti-cal issue in the case at hand. In my view, the court correctly determined that permitting questioning of the victim about this arrest warrant application would have served only to revictimize her.

The second arrest warrant application is dated August 18, 2001, and concerns a sexual assault on the victim by her uncle that took place between Christmas and the New Year in December, 2000. This document recites the victim's claim that her uncle digitally pene-trated her vagina and her uncle's admission that he did so. Thus, as to this second sexual assault on the victim in December, 2000, the admissions of the victim's uncle mirror the victim's allegations.

This document also indicates that on February 27, 2001, the affiant received a call from Ines Eaton, a department of children and families (department) worker, who indicated that after talking with the victim, "[the victim] began to change her story about her brother . . . sexually assaulting her. [The victim] told . . . Eaton that her [uncle] was the one who actually touched her inappropriately." During the rape shield hearing, the prosecutor represented to the court that, as a consequence of this incident, the victim's uncle

was convicted by plea and incarcerated for the crime of sexual assault in the first degree. At the time of this assault, the victim was twelve years old and her uncle was thirty-four.

This report provides no evidence of a past false accusation. Indeed, the victim's uncle fully admitted his culpability. As to the portion of the report that suggests that the victim was changing her story regarding the assault by her brother, the defendant argued, and my colleagues appear to accept as true, that the change in story to which the affiant refers concerns the use of force. To the contrary, the report makes it plain that the change in story to which the department worker allegedly made reference had nothing to do with the issue of force and consent but, rather, pertained to the victim's revelation that it was her uncle who had inappropriately touched her, an act that he fully admitted upon police questioning. Thus, whatever difference in the victim's story concerning the assault on her by her brother that may be suggested by this second report, it has no palpable bearing on any issue critical to the defendant's defense in the case at hand.

Finally, decisional law does not support the majority's view that any alleged inconsistencies in the victim's complaints in the prior assaults as demonstrated by the two arrest warrant applications should expose her to cross-examination about these incidents. Where a defendant seeks to question a victim about prior allegations of sexual assault, examination has been permitted only upon an offer of proof that such allegations were false. The mere suggestion that they may have been false has been deemed too speculative to avoid the proscriptions of the rape shield statute. See *State* v. *Sullivan*, 244 Conn. 640, 712 A.2d 919 (1998); *State* v. *Beliveau*, 237 Conn. 576, 678 A.2d 924 (1996); *State* v. *Smith*, 85 Conn. App. 96, 856 A.2d 466 (2004), aff'd, 280 Conn. 285, 907 A.2d 73 (2006); *State* v. *Morales*, 45 Conn.

App. 116, 694 A.2d 1356 (1997), appeals dismissed, 246 Conn. 249, 714 A.2d 677 (1998). Nor may a defendant introduce evidence that a victim has been sexually assaulted previously unless there is relevant and material evidence that links the prior assaults to the case at hand. See *State* v. *Kulmac*, 230 Conn. 43, 50–56, 644 A.2d 887 (1994).

The defendant relies principally on this court's decision in *State* v. *Manini*, supra, 38 Conn. App. 100. His reliance is misplaced. In *Manini*, this court found that the trial court abused its discretion in refusing the defendant a hearing to determine whether counsel should be permitted to cross-examine an alleged sexual assault victim about prior claims of sexual abuse where there was no proof that the claimed prior instances of abuse ever took place and where the victim's medical records disclosed that the victim suffered from sexual delusions and hallucinations. There, this court found that the alleged victim's history of hallucinations and sexual delusions was relevant and material to the issue of whether an assault actually took place.

*Manini* is, however, relevant to the case at hand for its holding that in order for a defendant to be entitled to a hearing pursuant to § 54-86f (4), the defendant must "make a preliminary showing that the evidence sought to be explored in the evidentiary hearing is relevant. The showing must be sufficient to enable the trial court to make an informed ruling in connection with the exercise of its discretion on the issue. That showing must be made as part of the offer of proof as a prerequisite to obtaining an evidentiary hearing to determine the admissibility of evidence of the victim's prior sexual conduct." Id., 114. Three years after *Manini*, our Supreme Court, in *State* v. *Sullivan*, supra, 244 Conn. 640, affirmed the trial court's decision not to allow the defendant to examine a sexual assault victim regarding a prior allegation of sexual assault. The Supreme Court

found that the trial court had correctly determined that the defendant's offer of proof did not allege facts that, if proven, would have demonstrated relevance sufficient to require a hearing under the rape shield statute. The court found, as well, that the trial court acted within its discretion in reasoning that the proffered evidence regarding a collateral incident would be irrelevant and distracting. Id., 651–52. Similarly, in *State* v. *Kulmac*, supra, 230 Conn. 43, our Supreme Court rejected a defendant's confrontation argument, upholding the trial court's decision not to permit counsel to cross-examine a victim about an alleged prior false allegation absent proof that the prior allegation was, in fact, false.

Cases in which this court or our Supreme Court have reversed the trial court's ruling refusing to permit the defendant to introduce evidence of prior sexual conduct on constitutional grounds have no parallel to the facts at hand. For example, in *State* v. *Rolon*, 257 Conn. 156, 777 A.2d 604 (2001), our Supreme Court determined that the trial court should have permitted the defendant to introduce evidence of a previous instance of sexual abuse perpetrated on the young victim "where the factual similarities between the present and previous instances could have: (1) demonstrated an alternative source for [the victim's] sexual knowledge; and (2) resulted in [her] confusion over the identity of the perpetrator." Id., 160. In *State* v. *Manini*, supra, 38 Conn. App. 100, as noted, this court held that where the defense was that the alleged sexual assault did not take place, and the defendant made a specific offer of proof relevant to a critical issue in the case, he should have been permitted to adduce evidence that the alleged victim had made prior unsubstantiated allegations of sexual assault and that she suffered from hallucinations and sexual delusions. In *State* v. *DeJesus*, supra, 270 Conn. 826, the Supreme Court reversed a sexual assault conviction where the defendant had presented a

defense of consent and had been prevented, at trial, from introducing evidence that the alleged victim was a prostitute. There, the Supreme Court found specifically that the defendant had raised a defense of consent in his statement to the police and in a violation of probation hearing. Id., 831. Under those circumstances, the court reasoned that evidence that the alleged victim was a prostitute bore direct relevance to the defense of consent raised by the defendant. Id., 839.

The case at hand is significantly different. Here, unlike the specific offers of proof in *Manini* and *DeJesus*, the defendant in this instance made no offer of proof of a prior false allegation; rather, he presented two police documents containing double and triple hearsay, neither of which contained any information relevant or material to a critical issue in the case. Also, unlike the cases in which the trial court has been faulted on review for not permitting questions regarding past sexual conduct, the defendant here presented no defense of consent, or that the victim was confused about the identity of the assailant, or that the assault did not take place. Rather, in his statement to the police, the defendant claimed that he did not have any sexual encounter with the victim and that he was in a different room at the time she claimed the assault took place. Short of an offer of proof that the victim has made past false allegations of sexual assault, the defendant's proffer constituted mere speculation. As the court indicated in *DeJesus*: "Not every ruling that prevents the defendant from introducing evidence . . . rises to the level of a violation of his constitutional rights." Id., 836.

On the basis of the foregoing, I would affirm the trial court's determination not to provide the defendant a hearing under § 54-86f (4) on the basis of an inadequate offer of proof because the defendant's proffer consisted of two prior allegations of sexual assault with matching admissions and convictions and because there was no

evidence that the victim falsely accused either perpetrator of sexually assaulting her. In my view, the court's correct application of the rape shield statute properly protected this young victim from the further trauma of an exploratory cross-examination regarding these offenses previously committed on her. Indeed, if the court had permitted such a fishing expedition, it would have been guilty of subjecting the victim to precisely the revictimization that the rape shield statute was enacted to prevent.

Because I agree with the trial court's determination regarding the rape shield claim, I must analyze the second issue on appeal regarding the court's failure to appoint a DNA expert for the defendant. In this regard, the defendant claims that (1) the court failed to afford him an evidentiary hearing on his request for expert assistance and (2) the court deprived him of his constitutionally protected due process rights to expert assistance in his defense. Because the defendant did not seek to introduce evidence and, thus, failed to sustain his burden of proving his indigence, I would not reach his claim that he was entitled to an expert.[5] The following additional procedural facts are relevant to a discussion of this claim.

---

[5] While I do not reach the issue of a constitutional right of indigent defendants to a DNA expert, I note that our Supreme Court has opined, in dicta, that where the state has access to expert testimony that it plans to utilize at trial, "the state should provide an indigent defendant access to an independent expert upon a showing of reasonable necessity by the defendant . . . ." *State* v. *Clemons*, 168 Conn. 395, 403, 363 A.2d 33, cert. denied, 423 U.S. 855, 96 S. Ct. 104, 46 L. Ed. 2d 80 (1975). Subsequent to *Clemons*, the United States Supreme Court, in *Ake* v. *Oklahoma*, 470 U.S. 68, 83, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985), held that due process requires that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed,

At the time of his arrest, the defendant was twenty-one years old, and he had recently come to Hartford from Puerto Rico. He was living in Hartford with his mother. When he was arraigned on February 14, 2002, a public defender was appointed to represent him. This appointment presupposes a finding of indigence. See General Statutes § 51-297. The court ordered the defendant held in custody under a $300,000 bond. When the case was transferred to part A on February 28, 2002, however, private counsel appeared in lieu of the public defender.

On July 10, 2002, when the state notified the defendant that an impending DNA test at the forensic laboratory was likely to consume the biological sample, the defendant waived his right to have an expert present at the procedure. The results of the first DNA test, made available to the defendant in a report in December, 2002, eliminated the defendant as the source of the DNA profile.[6] There is no indication that the defendant sought an explanation of this report. In response to the

and as in the case of the provision of counsel we leave to the States the decision of how to implement this right."

While *Ake* focused on an indigent defendant's right of access to a psychiatric expert, similar reasoning has been applied at the federal circuit court level to require provision of a hypnosis expert; see *Little* v. *Armontrout*, 835 F.2d 1240 (8th Cir. 1987), cert. denied, 487 U.S. 1210, 108 S. Ct. 2857, 101 L. Ed. 2d 894 (1988); and a battered spouse syndrome expert; see *Dunn* v. *Roberts*, 963 F.2d 308 (10th Cir. 1992); and several state courts have relied on the reasoning in *Ake* to require a DNA expert. See *Dubose* v. *State*, 662 So. 2d 1189 (Ala. 1995); *Prater* v. *State*, 307 Ark. 180, 820 S.W.2d 429 (1991); *Cade* v. *State*, 658 So. 2d 550 (Fla. App.), review denied, 663 So. 2d 631 (Fla. 1995); *Polk* v. *State*, 612 So. 2d 381 (Miss. 1992).

[6] This DNA test result was marked as a trial exhibit. It is the standard PCR STR test, which, in one part, appears to exclude the defendant as a biological contributor but in another part appears to indicate that no sperm could be recovered from the test. At trial, the forensic scientist who oversaw the test explained that if there had been no suspect in the test, the report would have simply indicated that no DNA determination could be made from the small trace of sperm collected, but that because the defendant was a known suspect, the report stated that he was excluded as a contributor.

colloquy regarding this first test, the state indicated that the forensic laboratory was going to be conducting a second test on the recovered sample.

At a hearing on December 18, 2002, the defendant moved for a bond reduction on the basis of the first DNA report and the fact that he had been incarcerated pretrial for approximately one year. In arguing on behalf of the defendant, counsel requested that the court reduce the bond to an amount that the family could afford to pay. In response, the court lowered the defendant's bond from $300,000 to $200,000. Subsequently, on February 5, 2003, with the results of the second test still not forthcoming, the defendant moved for a further bond reduction. As part of defense counsel's argument, he noted the presence of the defendant's family and commented that they were all willing to help him and that if there was any need for money, they were willing to "go with it." The court reduced the defendant's bond to $50,000 and restricted his movements, confining him to his mother's residence in Hartford.

In April, 2003, the results of the second DNA test were reported. Unlike the first test, this one identified the defendant's DNA as having been found on a biological sample taken from the victim.[7] Subsequently, on June 3, 2003, the defendant filed a written motion asking the court to appoint a DNA expert to assist in his defense. Specifically, the memorandum of law in support of the motion stated that a DNA expert was essential to assist in interpreting the test results and preparing an appropriate cross-examination, particularly in light of the differing DNA test results. Appended to this motion was an affidavit from the defendant in which he stated that he was living with his mother, that he

---

[7] During the proceedings, this second test, known as a PCR YSTR test was described as following normal PCR testing procedures but applying those testing procedures to the Y chromosome in the biological sample.

had recently been released from incarceration after one year of detention, that his family raised the money to pay his bond, that he was unable to work due to court-ordered restrictions and that he could not pay for experts or for counsel fees for trial. The defendant did not include any information concerning his assets or liabilities or those of his mother with whom he was then living, nor did he submit an application for public defender services. Furthermore, this motion did not indicate the amount of funds he was seeking from the court or the identity of particular experts who might provide meaningful assistance to the defense.

The court heard the defendant's motion on June 11, 2003. When asked by the court, counsel for the defendant indicated that he had not yet spoken with the scientist at the forensic laboratory who had conducted the DNA tests. In response to the defendant's motion, the state argued that the defendant had not proven his indigence and that he had not provided the court an adequately specific request for expert assistance. The court responded: "I am going to deny the motion at this time based upon the availability of funds to the defendant that were used for other purposes that could have been used for this. I am also going to deny the motion based upon the lack of a factual basis at this point because you have not even contacted the lab to find out exactly what it was they did and how they arrived at their opinion, and I'm going to deny the motion because you haven't provided me with the particulars to let me know who you intend to retain and how much it's going to cost to do it." In July, 2004, defense counsel reminded the court that the defendant had been denied funds for an expert. The court reiterated that it would not appoint a public defender or provide an expert for the defendant. At the close of the state's case, the defendant again renewed his motion for an expert, but the court declined to revisit the prior

ruling. While on appeal, the defendant filed a motion for rectification and articulation, requesting that the record be modified to "reflect in chamber discussions between [the judge, the prosecutor and defense counsel] regarding the defendant's request for a DNA expert, the cost of a DNA expert and the court's position on denying [the] defendant's request for the DNA expert [and] to reflect the in court chamber discussions about the defendant's indigency, inability to pay for an expert and [the] defendant's request for permission to apply for a public defender in order that the defendant could obtain an expert paid by the Division of Public Defender Services." Both this motion and the subsequent motion for review were denied.[8]

The defendant claims on appeal that the court improperly denied his right to an indigence hearing. The burden of proving indigence lies with the defendant. See *State* v. *Guitard,* 61 Conn. App. 531, 537, 765 A.2d 30, cert. denied, 255 Conn. 952, 770 A.2d 32 (2001). The term "indigent defendant" has been statutorily defined, in part, as meaning "(1) a person who is formally charged with the commission of a crime punishable by imprisonment and who does not have the financial ability at the time of his request for representation to secure competent legal representation and to provide other necessary expenses of legal representation . . . ." General Statutes § 51-297 (f). When a criminal defendant claims to be indigent, his or her request for representation is referred to a public defender for investigation. The public defender is charged with the responsibility of causing the applicant to "complete a written statement under oath or affirmation setting

---

[8] It is unfortunate that defense counsel failed to make a record of the information that was allegedly discussed in chambers while these discussions were fresh because it is axiomatic that in considering a defendant's claims on appeal, we are confined to the contents of the record.

forth his liabilities and assets, income and sources thereof, and such other information which the commission shall designate and require on forms furnished for such purpose." See General Statutes § 51-297 (a). Additionally, as pointed out by the defendant in the appendix to his appellate brief, when a defendant who is seeking the services of a public defender is living with a parent, the eligibility of the accused "shall also be evaluated on the basis of the financial circumstances of the accused and the parents or legal guardians." Guidelines for Determining Financial Eligibility for Public Defender Services, Policy Statement Adopted by Public Defender Services Commission October 12, 1976, as amended October 12, 1993. If, upon examination, a public defender determines that an applicant is not eligible for public defender services, the applicant has the right to appeal from that determination to the court. In sum, Connecticut has provided by statute for the representation of indigent criminal defendants to include expenses associated with the defense. The public defender services commission, in turn, has adopted guidelines for the determination of a criminal defendant's eligibility for public defender services, and, in seeking the assistance of a public defender, the accused has the burden of proving indigence.[9]

Although the record reflects that the defendant filed a motion requesting the appointment of an expert concerning the DNA evidence and anticipated a hearing on

[9] Although Connecticut has created an impressive public defender system to provide services to indigent defendants, it is not clear that these services are readily available to defendants who have private counsel but who are nevertheless unable, financially, to retain expert assistance necessary to their defense. Because, in this instance, I do not believe that the defendant made an adequate showing of indigence, I leave for another day the question of a privately represented yet indigent defendant's right of access to funds appropriated to the public defender services for indigent criminal defendants.

his motion, the record is devoid of any request by the defendant to offer evidence in support of his motion. "[U]nless otherwise required by statute, a rule of practice or a rule of evidence, whether to conduct an evidentiary hearing generally is a matter that rests within the sound discretion of the trial court." (Internal quotation marks omitted.) *State* v. *Guitard*, supra, 61 Conn. App. 538. Because the court had no statutory duty to conduct an evidentiary hearing, it did not abuse its discretion in failing to conduct such a hearing. Having not sought to introduce evidence at the hearing on his motion, or even to make an offer of proof as to evidence that he would like to offer, the defendant can hardly claim on appeal that the court improperly denied a request that he did not make. Although the defendant filed an affidavit regarding his inability to pay for an expert, his affidavit did not include any information concerning his assets or liabilities or those of his mother with whom he was then residing. Because the burden of proving indigence lies with the defendant, and he failed to provide the court with the requisite information, I cannot find that the court incorrectly denied his request for the appointment of an expert.[10]

Because I believe that the court properly applied the rape shield statute to protect the victim from being revictimized by the criminal process, and because I believe that the record adequately supports the court's denial of the defendant's motion for the appointment of an expert, I would affirm the defendant's conviction. Accordingly, I respectfully dissent.

---

[10] Because I conclude that the defendant did not meet the threshold requirement of proving his indigence, I do not reach the issue of the adequacy of his request for the appointment of an expert.