### STATE OF CONNECTICUT *v.* LUIS NORBERTO MARTINEZ (SC 18168)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued January 8—officially released April 27, 2010

*Harry Weller*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, *Anne Mahoney*, senior assistant state's attorney, and *Jessica Probolus*, special deputy assistant state's attorney, for the appellant (state).

*Annacarina Jacob*, senior assistant public defender, for the appellee (defendant).

*Pamela J. Favreau* filed a brief for the Connecticut Criminal Defense Lawyers Association as amicus curiae.

*Opinion*

NORCOTT, J. The state appeals, following our grant of its petition for certification, from the judgment of the Appellate Court reversing the judgment of conviction of the defendant, Luis Norberto Martinez, rendered after a jury trial, of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A), sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1), and risk of injury to a child in violation of General Statutes (Rev. to 2001) § 53-21 (a) (2), and remanding the matter for a new trial. *State* v. *Martinez*, 106 Conn. App. 517, 942 A.2d 1043 (2008). On appeal, the state claims, inter alia, that: (1) the Appellate Court improperly had concluded that the trial court abused its discretion in denying the defendant's request for an evidentiary hearing to determine the admissibility of the claims of the victim, J,[1] regarding two alleged sexual assaults committed by

_____

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

family members, as an exception to the rape shield statute, General Statutes § 54-86f;[2] and (2) the trial court properly denied the defendant's request for a state funded DNA expert witness.[3] We agree with the state and, accordingly, we reverse the judgment of the Appellate Court.

[2] General Statutes § 54-86f provides in relevant part: "In any prosecution for sexual assault under sections 53a-70 . . . and 53a-71 . . . no evidence of the sexual conduct of the victim may be admissible unless such evidence is (1) offered by the defendant on the issue of whether the defendant was, with respect to the victim, the source of semen, disease, pregnancy or injury, or (2) offered by the defendant on the issue of credibility of the victim, provided the victim has testified on direct examination as to his or her sexual conduct, or (3) any evidence of sexual conduct with the defendant offered by the defendant on the issue of consent by the victim, when consent is raised as a defense by the defendant, or (4) otherwise so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights. Such evidence shall be admissible only after a hearing on a motion to offer such evidence containing an offer of proof. On motion of either party the court may order such hearing held in camera, subject to the provisions of section 51-164x. If the proceeding is a trial with a jury, such hearing shall be held in the absence of the jury. If, after hearing, the court finds that the evidence meets the requirements of this section and that the probative value of the evidence outweighs its prejudicial effect on the victim, the court may grant the motion. . . ."

[3] We granted the state's petition for certification to appeal limited to the following issues: "(1) Did the Appellate Court correctly determine that the trial court improperly failed to grant the defendant an evidentiary hearing to determine the admissibility of evidence of the victim's two prior sexual assaults and correctly ordered the remedy of a new trial rather than an evidentiary hearing?

"(2) Whether the remedy ordered by the Appellate Court with regard to two counts of the defendant's conviction is improper because the error identified by the Appellate Court, even if upheld, is wholly irrelevant to and had no effect upon those counts?

"(3) Did the trial court deprive the defendant of his due process rights when it denied his request for funds for an expert witness?" State v. Martinez, 290 Conn. 902, 962 A.2d 795 (2009).

The Appellate Court did not decide the third certified issue, namely, whether the trial court deprived the defendant of his due process rights when it denied his request for funds for an expert witness. Nevertheless, in its petition for certification, the state requested that we exercise our general supervisory power and review this issue in the interest of judicial economy. The defendant subsequently raised this issue as one of his alternative grounds for affirming the judgment of the Appellate Court. Since neither

The record and the Appellate Court opinion reveal the following relevant facts that the jury reasonably could have found, and procedural history. "On February 13, 2002 . . . J . . . was thirteen years old and lived on the second floor of a multifamily house with her mother and two sisters. The defendant, who was twenty-one years old, lived with his mother on the third floor of the same house. On the evening of February 13, 2002, J walked by herself across the street to a store to purchase a sticker. When J came back from the store, she saw the defendant in front of her apartment. . . . [T]he defendant then grabbed her by the arm and took her to the back of the house, where he proceeded to force his hands inside her pants, touch her buttocks and put his fingers inside her vagina. He then grabbed her arm and took her up the back stairs to his apartment. The defendant took J to a bedroom, pushed her on the bed, pulled down her pants and forced his penis into her vagina. The bedroom door was partially open, so J was able to see the defendant's sister in the living room.

"When the defendant was finished with J, he pulled her into the bathroom where he covered her mouth and told her not to scream. At that point, the defendant's sister knocked on the door to tell the defendant that he had a telephone call. The defendant then rushed J out of the apartment through the back door. J ran down the stairs with the defendant behind her. The defendant ran across the street to his sister's apartment. When J arrived at the front of the house, she ran upstairs to her apartment and immediately disclosed to her mother what had happened. Soon thereafter, J was taken to a hospital where physicians examined her and performed a sexual assault examination.

party objects, and both have thoroughly briefed the issue for our consideration, we will invoke our supervisory powers, pursuant to Practice Book § 60-2, in order to decide the issue. See, e.g., *State* v. *James*, 261 Conn. 395, 410–12, 802 A.2d 820 (2002) (exercising general supervisory powers in interest of judicial economy to decide noncertified issue).

"The defendant was arrested on the night of the sexual assault. With regard to his conduct at the time of J's assault, the defendant told the police that he had been in his mother's bedroom using drugs when his sister walked into the apartment. He then stated that he ran to the bathroom, flushed the drugs down the toilet and left the apartment by way of the back stairs so his sister would not see him high on drugs. He claims, therefore, that the encounter with [J] never occurred." Id., 519–20.

The state charged the defendant with kidnapping in the first degree in violation of § 53a-92 (a) (2) (A), two counts of sexual assault in the first degree in violation of § 53a-70 (a) (1) (for penile penetration and digital penetration), sexual assault in the second degree in violation of § 53a-71 (a) (1), and risk of injury to a child in violation of General Statutes (Rev. to 2001) § 53-21 (a) (2). The case was tried to the jury, which subsequently returned a verdict finding the defendant guilty of one count each of kidnapping in the first degree, sexual assault in the first degree, sexual assault in the second degree and risk of injury to a child.[4] The trial court rendered a judgment of conviction in accordance with the jury's verdict and sentenced the defendant to a total effective sentence of twenty-five years imprisonment, execution suspended after twenty years, followed by five years of probation.

The defendant appealed from the judgment of conviction to the Appellate Court, claiming, inter alia, that the trial court improperly had: (1) precluded him from questioning J about two prior incidents in which she had claimed that she had been sexually assaulted by family members, without first holding a hearing to

---

[4] The trial court declared a mistrial as to a second count of sexual assault in the first degree (alleging digital penetration) in violation of § 53a-70 (a) (1) after the jury could not reach a unanimous verdict on this count.

determine the relevance of that evidence to the defendant's claims regarding J's credibility; and (2) denied his request for a state funded DNA expert witness without first conducting an indigency hearing. *State* v. *Martinez*, supra, 106 Conn. App. 519 and n.2. In a divided opinion, the Appellate Court reversed the judgment of the trial court and remanded the case for a new trial, concluding that the trial court had abused its discretion in precluding the defendant from questioning J about her prior sexual conduct without first holding a hearing to determine the relevance of that evidence to the defendant's claims as to whether he had used force in sexually assaulting J.[5] Id., 526. Specifically, the Appellate Court majority determined that "the defendant's offer of proof satisfied the requirement of demonstrating a sufficient basis for the court to decide whether to allow the defendant to present J's testimony in an evidentiary hearing"; id.; pursuant to § 54-86f (4). See footnote 2 of this opinion. In light of that conclusion, the Appellate Court did not address the defendant's claim that the trial court improperly had denied his request for a state funded DNA expert without first holding an indigency hearing.[6] Id., 519 n.2. This certified appeal followed. See footnote 3 of this opinion.

On appeal, the state claims that the Appellate Court improperly concluded that the trial court abused its

[5] Because the Appellate Court concluded that J's prior sexual conduct was relevant to whether the defendant had used force in committing the sexual assault, it did not address whether it was relevant to J's credibility. *State* v. *Martinez*, supra, 106 Conn. App. 526.

[6] Judge Bishop dissented from the Appellate Court majority, concluding that the trial court properly precluded the defendant from questioning J about the two prior instances of sexual assault. *State* v. *Martinez*, supra, 106 Conn. App. 529. Because he agreed with the trial court's determination on the rape shield claim, Judge Bishop also reached the issue of the trial court's failure to appoint a DNA expert for the defendant; he concluded that the defendant failed to prove his indigence and that, therefore, the trial court did not abuse its discretion by denying his request for state funded expert assistance. Id., 551.

discretion in denying the defendant an evidentiary hearing to determine the admissibility of the prior sexual assaults of J under § 54-86f (4), and that, even if the Appellate Court was correct, remand for a new trial was not the appropriate remedy. The state also claims that the trial court properly denied the defendant's request for a state funded DNA expert witness. In response, the defendant contends otherwise, and also claims, as an alternative ground for affirming the judgment of the Appellate Court, that the trial court improperly failed to grant the defendant an evidentiary hearing to determine the admissibility of J's prior accusations of sexual assault for purposes of impeaching J's credibility, since such evidence would have cast doubt on whether J and the defendant had engaged in sexual activity and established that J had a possible motive to testify falsely against the defendant. We address each claim in turn and set forth additional relevant facts where necessary in the context of each claim.

I

We first address the state's claim that the Appellate Court improperly determined that the trial court abused its discretion in denying the defendant an evidentiary hearing to consider the admissibility of the prior sexual assaults of J under the rape shield statute, § 54-86f. See footnote 2 of this opinion. Specifically, the state contends that the defendant failed to make an adequate offer of proof as to the falsity of the prior accusations, and that evidence of such prior assaults is inadmissible on the issue of force when consent is not a defense. In response, the defendant claims that the Appellate Court correctly concluded that the trial court improperly precluded him from questioning J about her prior claims of sexual assault because the defendant had adequately demonstrated the falsity of those claims. The defendant also claims, as an alternative ground for affirming the judgment of the Appellate Court, that the prior false

claims were relevant to impeach J's character for truthfulness, and also may have revealed J's motive to lie in the present case. We agree with the state that the trial court properly exercised its discretion by precluding inquiry into J's prior sexual assaults because the defendant's offer of proof failed to establish the falsity of those accusations, and the incidents were, therefore, not relevant to any critical issue in the present case.[7] Further, because we conclude that the defendant failed to demonstrate the falsity of the prior sexual assault allegations, we reject his alternative ground for affirmance.

The record and the Appellate Court dissenting opinion reveal the following additional relevant facts and procedural history. "The state filed a motion in limine seeking to preclude the defendant from offering into evidence J's prior sexual conduct. The defendant presented evidence that, prior to the incident in question, J had accused both her stepuncle and her brother of sexually assaulting her in two different incidents. Both men pleaded guilty.[8] The defendant then filed an objection to the motion in limine and requested a hearing

[7] Because we conclude that the Appellate Court improperly determined that the trial court improperly precluded the defendant from questioning J about her two prior sexual victimizations without first holding an evidentiary hearing, we need not reach the state's claim with respect to the propriety of the remedy ordered by the Appellate Court.

[8] Regarding these two prior instances, the prosecutor stated: "I'll make an offer to the court as an officer of the court that one was [a plea made pursuant to *North Carolina* v. *Alford*, 400 U.S. 25, 33, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970)], but he—he made admissions to the police officers when he was arrested. The other—I think the other one may have been [an] *Alford* plea as well, but that was a full confession. So, I think they recognized the strength of the state's case.

"And each of those, they received jail time and probation in which they're going to have to make admissions. . . . Those people have already [pleaded] guilty. The victim—her credibility has already been sustained by the court." See generally id. (permitting defendant to enter plea containing protestations of innocence while voluntarily, knowingly and understandingly consenting to imposition of prison sentence).

on whether he should be permitted to question J under one of the exceptions to the rape shield statute . . . § 54-86f. The defendant argued that the evidence was relevant to two issues: J's credibility and whether the defendant used force in kidnapping and sexually assaulting her.[9] As part of his offer of proof, the defendant presented to the court two police reports based on complaints filed by J. One police report concerned the incident with J's brother, and the other involved the incident with J's stepuncle. In addition to offering the police reports, the defendant also argued that he should be allowed to question J about falsely reporting that her brother had forced her against her will to have sex. The defendant cited the police reports for his assertion that J may have made false accusations against her brother. First, he noted that in the police report regarding the sexual assault by J's brother, J's sister, M, had stated that this was the second time that she had observed J having sex with their brother. On a previous occasion, M had observed J having sex with her brother on his bed. With regard to the incident at issue in the police report, M stated that she had been watching television when the brother had come into the room to tell her that J wanted him to shower with her. M stated that a few minutes later, she opened the bathroom door and observed J and her brother having sex in the shower. In contrast, J had reported to the police that when she got out of the shower, her brother came into the bathroom and began to touch her 'private parts' inappropriately. She stated that she attempted to

---

[9] Further, during this colloquy between the court and defense counsel, the latter stated: "And we have a good faith belief . . . based upon some family members . . . because they live in the same building. They know that there have been prior incidents with [J] including prior incident[s] that resulted in arrests and prosecution of people.

"And we believe that that's relevant to the issue of her credibility and to the issue of whether . . . what she's alleging about [the defendant] actually took place."

get away, but her brother pulled her by the hand into his bedroom, closed the door, put J on the floor and began having sex with her.

"The defendant also noted that in the police report regarding the incident with J's stepuncle, a police officer stated that a social worker had told him that J began to change her story about her [brother] having sexually assaulted her. The officer stated that J had told the social worker that, in fact, it was her stepuncle who actually had touched her inappropriately. The defendant argued that this statement by J to the social worker coupled with M's account of the incident with J's brother served to call J's credibility into question. The defendant wanted to question J about what she told the police regarding the incident with her brother and about whether she changed her story regarding that incident.

"The court found that the prior incidents of sexual assault were not relevant [because the guilty pleas in the two cases had vindicated J's allegations].[10] The court, therefore, limited the defendant's cross-examination of J to asking her whether she ever had made a false report regarding sexual assault. In addition, the court found that the incidents were protected by the rape shield statute and that, even if the prior incidents were rele-

---

[10] During one colloquy with defense counsel, the court stated: "[Y]ou have to make a showing that you're going to question [J] about relevant information. This is not going to be a fishing expedition here to try and see if you can find something that you can use. The record as it stands today is that she was—there were two other cases and they both ple[aded] guilty. That's not the same as saying, well, she made false allegations." Later, the court stated: "If she accused somebody and it was determined to be false, that's a different story. But here, apparently, she was assaulted and . . . there was a conviction. Twice. There was no evidence of any falsehood on her part." Similarly, in another discussion, the court stated: "Well, that's— it's still a conviction. And that does not make it untrue. In fact, the fact that the people ple[aded] guilty, whether it's under the *Alford* doctrine or not, there was a [finding] of guilty. There was no proof that her allegations were false; to the contrary, apparently they were correct."

vant, their probative value did not outweigh their preju-
dicial impact. The defendant renewed his objection on
the following day on the basis of *State* v. *DeJesus*, 270
Conn. 826, 841, 856 A.2d 345 (2004). He stated that the
prior incidents were relevant to J's credibility regarding
the element of force and to whether the assault
occurred at all. [Distinguishing *DeJesus* from the facts
of the present case],[11] [t]he court refused to change its
ruling.[12] The court did state, however, that the defen-
dant's defense, at this point, was that he did not commit
the assault but that if the scope of the defense changed
later on in the trial, the court would reconsider its
ruling." *State* v. *Martinez*, supra, 106 Conn. App. 520–23.

We begin our analysis of the state's claim by setting
forth the applicable standard of review. "Our analysis
of the [state's] . . . [claim] is based on well established
principles of law. The trial court's ruling on the admissi-
bility of evidence is entitled to great deference. . . .
[T]he trial court has broad discretion in ruling on the
admissibility . . . of evidence. . . . The trial court's
ruling on evidentiary matters will be overturned only
upon a showing of a clear abuse of the court's discre-

[11] During a colloquy between the court, defense counsel, and the prosecu-
tor, the prosecutor stated: "Because I don't have [*DeJesus*] in front of me
. . . it's unclear to me whether or not in [that] case the claim by the defen-
dant was that she engaged in consensual sex because in fact she was a
prostitute. If that's the case, that's a very different defense than the one
that presents from counsel on this." The court responded: "That's exactly
what happened. . . . [In *DeJesus*] the defendant testified that he—that he
agreed—he admitted they had sexual intercourse. But he claimed that it
was consensual and that it was an act of prostitution on her part. And that
was the only evidence that they had.

"So that case is very different from this case where the defense has not
been consent at all. The defense has been, I didn't do it. I—she wasn't even
there in the apartment."

[12] The court stated: "[T]he police reports don't say exactly what you just
related. There's a little gloss that you've put on it.

"But viewing the prior—the two prior cases when she was twelve years
old and this case, they're not similar. They don't go to any issue that would
override the rape shield statute that the court has seen so far in the record."

tion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *Ritrovato*, 280 Conn. 36, 50, 905 A.2d 1079 (2006).

"The rape shield statute excludes evidence of prior sexual conduct of the victim of a sexual assault, unless one of the statutory exceptions is satisfied." *State* v. *Christiano*, 228 Conn. 456, 469, 637 A.2d 382, cert. denied, 513 U.S. 821, 115 S. Ct. 83, 130 L. Ed. 2d 36 (1994). "We are mindful that the rape shield statute was enacted specifically to bar or limit the use of prior sexual conduct of an alleged victim of a sexual assault because it is such highly prejudicial material. . . . Our legislature has determined that, except in specific instances, and taking the defendant's constitutional rights into account, evidence of prior sexual conduct is to be excluded for policy purposes. Some of these policies include protecting the victim's sexual privacy and shielding her from undue harassment, encouraging reports of sexual assault, and enabling the victim to testify in court with less fear of embarrassment. . . . Other policies promoted by the law include avoiding prejudice to the victim, jury confusion and waste of time on collateral matters." (Internal quotation marks omitted.) *State* v. *Ritrovato*, supra, 280 Conn. 53.

The rape shield statute, § 54-86f, provides in relevant part: "In any prosecution for sexual assault under sections 53a-70 . . . and 53a-71 . . . no evidence of the sexual conduct of the victim may be admissible unless such evidence is (1) offered by the defendant on the issue of whether the defendant was, with respect to the victim, the source of semen, disease, pregnancy or injury, or (2) offered by the defendant on the issue of credibility of the victim, provided the victim has testified on direct examination as to his or her sexual conduct, or (3) any evidence of sexual conduct with the

defendant offered by the defendant on the issue of consent by the victim, when consent is raised as a defense by the defendant, or (4) otherwise so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights. . . ." See also footnote 2 of this opinion.

"A defendant who seeks to introduce evidence under one of the exceptions of § 54-86f must first make an offer of proof." *State* v. *Cecil J.*, 99 Conn. App. 274, 280–81, 913 A.2d 505 (2007), aff'd, 291 Conn. 813, 970 A.2d 710 (2009). The defendant contends that the Appellate Court correctly determined that his offer of proof "presented facts that tended to demonstrate the falsity of J's prior allegations." *State* v. *Martinez*, supra, 106 Conn. App. 526. After a careful review of the record, we conclude that the defendant did not make an adequate offer of proof and, therefore, that the trial court did not abuse its discretion in denying his request to inquire about J's prior sexual assaults.

"Offers of proof are allegations by the attorney . . . in which he represents to the court that he could prove them if granted an evidentiary hearing. . . . The purpose of an offer of proof has been well established by our courts. First, it informs the court of the legal theory under which the evidence is admissible. Second, it should inform the trial judge of the specific nature of the evidence so that the court can judge its admissibility. Third, it creates a record for appellate review." (Internal quotation marks omitted.) *State* v. *Payne*, 100 Conn. App. 13, 21 n.5, 917 A.2d 43, cert. denied, 282 Conn. 914, 924 A.2d 139 (2007). "Additionally, an offer of proof should contain specific evidence rather than vague assertions and sheer speculation." (Internal quotation marks omitted.) *State* v. *Martinez*, supra, 106 Conn. App. 54 (*Bishop, J.*, dissenting). Moreover, in this context, "[t]he defendant bears the burden of establishing the relevance of proffered testimony. In order

to get such evidence before the jury, he must make a showing that, in fact, the prior complaint was: (1) made by the victim; and (2) *false*." (Emphasis added.) *State* v. *Sullivan*, 244 Conn. 640, 648–49, 712 A.2d 919 (1998); see also *State* v. *Slater*, 23 Conn. App. 221, 225, 579 A.2d 591 (1990) ("[u]nless [the victim] had raised a false claim before, her conduct with another man ha[s] no bearing on her conduct with this defendant or on the credibility of her testimony in this case" [internal quotation marks omitted]).

Our review of the record reveals that the defendant never offered any specific evidence of falsity but, rather, referred to two arrest warrant applications containing two isolated statements by third parties, and made a vague and speculative reference to the possibility of calling unnamed witnesses with no indication as to what any of them would say under oath. The defendant, nevertheless, contends that these reports demonstrate that J had made prior false complaints, and that, therefore, these statements are relevant to the issue of J's credibility, as well as to the critical issue of force. The Appellate Court agreed with the defendant, basing its opinion on the two isolated statements from the arrest warrant applications: "First . . . J's sister, M, had stated that this was the second time she had observed J having sex with her brother. Additionally, M stated that with regard to the incident with J's brother, J's brother had told M that J wanted her brother to shower with her, thereby implying the act of sex between J and her brother may have been consensual. Second . . . the police officer writing the report had been told by a social worker interviewing J that after J made her initial complaint, she had changed her story regarding her brother." *State* v. *Martinez*, supra, 106 Conn. App. 525. On the basis of the record as a whole, we disagree with the defendant's argument and the Appellate Court's conclusion.

The first document, the arrest warrant application dated February 1, 2001, pertains to a sexual assault committed on J by her brother on December 1, 2000, when he was seventeen years old and she was twelve. The arrest warrant application states that J reported that her brother had vaginal intercourse with her and that, upon questioning, her brother admitted that, while lying in bed with J, he had sex with her for "fifteen to twenty minutes." The application also includes details of a forensic examination of J at a hospital that revealed physical findings consistent with J's allegations.[13] We find nothing in this arrest warrant application that demonstrates a false allegation on the part of J. As for the statement by J's sister, M, there is nothing in the rendition of M's statement provided in the application that negates J's allegations that her brother used force to have sex with her both of the times M observed them engaged in that conduct. Even when M's statement is viewed in the light most favorable to the defendant, it merely implies that the act of showering together was initiated by J, but not that J initiated the sexual intercourse itself. Regardless, because J was twelve years old at the time of this assault and, therefore, not legally capable of consenting to sexual intercourse with her seventeen year old brother; see General Statutes § 53a-70 (a) ("[a] person is guilty of sexual assault in the first degree when such person . . . [2] engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person"); M's statement, even if accurate, merely provides additional proof that her brother in fact sexually assaulted J on two occasions. Thus, the February 1, 2001 arrest warrant application did not constitute evidence of a prior false

---

[13] As noted, during a colloquy between the trial court, prosecutor, and defense counsel, the prosecutor made a representation to the court that J's brother also had pleaded guilty to risk of injury to a child, and was incarcerated.

allegation and, accordingly, was not relevant to any critical issue in the present case.

The second arrest warrant application, dated August 18, 2001, relates to a sexual assault on then twelve year old J committed by her then thirty-four year old stepuncle that transpired between Christmas and New Year's Day in December, 2000. The application documents J's claim that her stepuncle digitally penetrated her vagina and her stepuncle's admission to that act.[14] The application also indicates that, on February 27, 2001, the affiant, a police officer, received a telephone call from Ines Eaton, a department of children and families employee, who stated that, "after executing a home visit with [J], she began to change her story about her brother . . . sexually assaulting her. [J] told . . . Eaton that her stepuncle . . . was the one who actually touched her inappropriately." Although this statement indicates an apparent recantation by J as to the sexual assault claim against her *brother*, it does not prove conclusively that such claim was demonstrably false. See, e.g., *State* v. *Smith*, 85 Conn. App. 96, 105, 856 A.2d 466 (2004) (concluding that defendant failed to demonstrate falsity of victim's allegation because victim "had made an allegation of sexual abuse by her father . . . was pressured by family members to recant that accusation and . . . her father had pleaded guilty to risk of injury to a child under the *Alford* doctrine stemming from [the victim's] allegations"), aff'd, 280 Conn. 285, 907 A.2d 73 (2006); *State* v. *Morales*, 45 Conn. App. 116, 125, 694 A.2d 1356 (1997) (victim's flawed memory insufficient to establish falsity), appeal dismissed, 246 Conn. 249, 714 A.2d 677 (1998); *State* v. *Barrett*, 43 Conn. App. 667, 675, 685 A.2d 677 (1996) ("[w]hile these inconsistencies may point to the victim's flawed mem-

---

[14] As noted previously, the prosecutor represented to the trial court that J's stepuncle had pleaded guilty and was incarcerated for the crime of sexual assault in the first degree.

ory of the prior assaults, they do not supply evidence of falsity"), cert. denied, 240 Conn. 923, 692 A.2d 819 (1997); cf. *State* v. *Spigarolo*, 210 Conn. 359, 372, 556 A.2d 112 ("the trial court did not abuse its discretion in permitting [an expert witness] to testify that it is not unusual for sexually abused children to give inconsistent or incomplete accounts of the alleged incidents"), cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989). Indeed, although there were different versions of the events surrounding the sexual assault on J by her brother, and in spite of this statement made by Eaton, J's brother was, nevertheless, convicted and incarcerated on the basis of an *Alford* plea to the charge of risk of injury to a child. Again, because J was younger than the age of thirteen at the time of this offense, her brother's admission inculpated him for the crime of sexual assault in the first degree in violation of § 53a-70 (a) (2), regardless of whether J consented to such sexual conduct, because, at the age of twelve, she was legally incapable of consent. Thus, as with the first application, the August 18, 2001 arrest warrant application did not constitute evidence of a prior false allegation and was not relevant to any critical issue in the present case and, therefore, the trial court did not abuse its discretion in determining that permitting questioning of J on this arrest warrant application would have served only to revictimize her.

The defendant's reliance on *State* v. *DeJesus*, supra, 270 Conn. 826, and *State* v. *Manini*, 38 Conn. App. 100, 659 A.2d 196, cert. denied, 234 Conn. 920, 661 A.2d 99 (1995), is misplaced. In *State* v. *DeJesus*, supra, 831, this court reversed a sexual assault conviction where, unlike in the present case, the defendant had presented a defense of consent in a statement to the police and in a violation of probation hearing, and had been precluded, at trial, from introducing evidence that the alleged victim was a prostitute. On the basis of the

factual circumstances present therein, this court held that evidence that the alleged victim was a prostitute had direct relevance to the defense of consent raised by the defendant and was, therefore, admissible under § 54-86f (4). Id., 839, 844. In *State* v. *Manini*, supra, 102, 115, the Appellate Court concluded that the trial court abused its discretion in refusing the defendant a hearing to determine whether counsel should be permitted to cross-examine an alleged sexual assault victim about prior claims of sexual abuse when there was no proof that the claimed prior instances of abuse ever took place and where the victim's medical records disclosed that she suffered from sexual delusions and hallucinations. The Appellate Court found in *Manini* that the alleged victim's history of hallucinations and delusions was relevant and material to the issue of whether an assault actually took place, pursuant to § 54-86f (4). Id., 115.

In the present case, unlike in either *DeJesus* or *Manini*, the defendant made no offer of proof of a prior false allegation. Rather, he presented two police arrest warrant applications, neither of which contained any information relevant to a critical issue in the case. The defendant also failed to present a defense of consent, instead claiming, in his statement to the police, that he had not had a sexual encounter with J and that he had been in a different room at the time she claimed the assault transpired. We conclude, therefore, that the trial court properly exercised its discretion by precluding inquiry into J's prior sexual assaults, as they were not relevant to any critical issue in the present case.[15]

[15] As an alternative ground for affirming the judgment of the Appellate Court, the defendant claims that J's prior sexual assault allegations are relevant for impeachment purposes, namely, to establish a possible motive to lie on her part. Because we conclude that the defendant failed to demonstrate the falsity of the prior sexual assault allegations, we reject the defendant's alternative ground for affirmance. See *State* v. *Sullivan*, supra, 244 Conn. 652 ("[T]he trial court acted within its discretion in excluding the evidence under the general evidentiary rules governing impeachment by

Accordingly, we do not reach the issue of whether the Appellate Court ordered the proper remedy.

II

We next consider whether the trial court properly denied the defendant's request for a state funded DNA expert. See footnote 3 of this opinion. Specifically, in response to the defendant's claim before the Appellate Court that, as an indigent defendant, he had a constitutional due process right to a court-appointed DNA expert, the state contends, in agreement with Judge Bishop's dissenting opinion; *State* v. *Martinez*, supra, 106 Conn. App. 551; that the defendant failed to sustain his burden of proving his indigence and that, consequently, he is not entitled to appellate review of his constitutional claim. The state claims that if we do, nevertheless, review the constitutional claim, the state satisfies the applicable constitutional requirements by providing indigent defendants access to expert witnesses through the office of the chief public defender, whose services the defendant had declined. Moreover, the state claims that the defendant failed to establish that he needed a state funded DNA expert. In response, the defendant contends that the trial court improperly based its ruling on third party resources used to post the defendant's bond and to retain private counsel, and conditioned its reconsideration of the defendant's request for an expert upon the state's joint stipulation. The defendant also claims that, because the state sought to use "novel science" against the defendant, he was

prior misconduct. . . . The trial court reasonably could have concluded that the claimed events . . . had minimal bearing on the victim's credibility and would have injected a collateral issue into the trial." [Citation omitted.]). The defendant, nevertheless, contends that his inquiry into the prior sexual assaults would establish that J lied in the present case "to avoid getting in trouble with her mother." Certainly the defendant was free to explore that subject on cross-examination based on the facts surrounding this incident. That he failed to do so at trial is not relevant to any action on the part of the trial court in denying his inquiry into the prior sexual assaults.

entitled to an expert under *State* v. *Clemons,* 168 Conn. 395, 403, 363 A.2d 33, cert. denied, 423 U.S. 855, 96 S. Ct. 104, 46 L. Ed. 2d 80 (1975), and that, as an indigent defendant, he was constitutionally entitled to a state funded expert witness to counter expert testimony presented by the state that is derived from new scientific technology. We agree with the state that the trial court properly denied the defendant's request for a state funded DNA expert because the defendant failed to sustain his burden of proving his indigence. We therefore do not reach the defendant's constitutional claim that, as an indigent defendant, he was entitled to a state funded expert witness.

The record and the Appellate Court dissenting opinion reveal the following additional facts that the jury reasonably could have found, and procedural history relevant to our resolution of this claim. "At the time of his arrest, the defendant was twenty-one years old, and he had recently come to Hartford from Puerto Rico. He was living in Hartford with his mother. When he was arraigned on February 14, 2002, a public defender was appointed to represent him. This appointment presupposes a finding of indigence. See General Statutes § 51-297.[16] The court ordered the defendant held in custody under a $300,000 bond. When the case was transferred to part A [of the Superior Court] on February 28, 2002, however, private counsel appeared in lieu of the public defender.

"On July 10, 2002, when the state notified the defendant that an impending DNA test at the forensic laboratory was likely to consume the biological sample, the

---

[16] General Statutes § 51-297 provides in relevant part: "(f) As used in this chapter 'indigent defendant' means (1) a person who is formally charged with the commission of a crime punishable by imprisonment and who does not have the financial ability at the time of his request for representation to secure competent legal representation and to provide other necessary expenses of legal representation . . . ."

defendant waived his right to have an expert present at the procedure. The results of the first DNA test [a standard polymerase chain reaction test, known as a PCR STR test (standard STR test)], made available to the defendant in a report in December, 2002, [were inconclusive as to whether] the defendant [was] the source of the DNA profile. There is no indication that the defendant sought an explanation of this report. In response to the colloquy regarding this first test, the state indicated that the forensic laboratory was going to be conducting a second test on the recovered sample.

"At a hearing on December 18, 2002, the defendant moved for a bond reduction on the basis of the first DNA report and the fact that he had been incarcerated pretrial for approximately one year. In arguing on behalf of the defendant, counsel requested that the court reduce the bond to an amount that the family could afford to pay. In response, the court lowered the defendant's bond from $300,000 to $200,000. Subsequently, on February 5, 2003, with the results of the second test still not forthcoming, the defendant moved for a further bond reduction. As part of defense counsel's argument, he noted the presence of the defendant's family and commented that they were all willing to help him and that if there was any need for money, they were willing to 'go with it.' The court reduced the defendant's bond to $50,000 [and he was subsequently released on bond] . . . . [The court] restricted his movements, confining him to his mother's residence in Hartford.

"In April, 2003, the results of the second DNA test were reported.[17] Unlike the first test, [the second test]

_____

[17] The standard STR test did not completely eliminate the defendant as a source but, rather, was unable to identify any male DNA. Therefore, the second test, a PCR YSTR test designed specifically to identify markers in the male or Y chromosome, was administered. Carll Ladd, supervisor of the DNA section of the department of public safety Connecticut forensic laboratory, testified in response to a question regarding why the second test was performed: "[B]ecause based on the serological findings in this first report . . . semen was detected on one item and sperm on another.

identified the defendant's DNA as having been found on a biological sample taken from [J]. Subsequently, on June 3, 2003, the defendant filed a written motion asking the court to appoint a DNA expert to assist in his defense. Specifically, the memorandum of law in support of the motion stated that a DNA expert was essential to assist in interpreting the test results and preparing an appropriate cross-examination, particularly in light of the differing DNA test results. Appended to this motion was an affidavit from the defendant in which he stated that he was living with his mother, that he had recently been released from incarceration after one year of detention, that his family raised the money to pay his bond, that he was unable to work due to court-ordered restrictions and that he could not pay for experts or for counsel fees for trial. The defendant did not include any information concerning his assets or liabilities or those of his mother with whom he was then living, nor did he submit an application for public defender services. Furthermore, this motion did not indicate the amount of funds he was seeking from the court or the identity of particular experts who might provide meaningful assistance to the defense.

"The court heard the defendant's motion on June 11, 2003. When asked by the court, counsel for the defendant indicated that he had not yet spoken with the scientist at the forensic laboratory who had conducted the DNA tests. In response to the defendant's motion, the state argued that the defendant had not proven his indigence and that he had not provided the court an adequately specific request for expert assistance. The court responded: 'I am going to deny the

However, on the basis of the standard STR typing, we were not able to generate a profile other than from the female. So in an effort to eliminate the individual compared in this particular case, we did a procedure that would have a better shot at detecting the male profile, which is what we were able to do."

motion at this time based upon the availability of funds to the defendant that were used for other purposes that could have been used for this. I am also going to deny the motion based upon the lack of a factual basis at this point because you have not even contacted the lab to find out exactly what it was they did and how they arrived at their opinion, and I'm going to deny the motion because you haven't provided me with the particulars to let me know who you intend to retain and how much it's going to cost to do it.'[18] In July, 2004, defense counsel reminded the court that the defendant had been denied funds for an expert. The court reiterated that it would not appoint a public defender or provide an expert for the defendant. At the close of the state's case, the defendant again renewed his motion for an expert, but the court declined to revisit the prior ruling. While on appeal, the defendant filed a motion for rectification and articulation, requesting that the record be modified to 'reflect in chamber discussions between [the judge, the prosecutor and defense counsel] regarding the defendant's request for a DNA expert, the cost of a DNA expert and the court's position on denying [the] defendant's request for the DNA expert [and] to reflect the in court chamber discussions about the defendant's indigency, inability to pay for an expert and [the] defendant's request for permission to apply for a public defender in order that the defendant could obtain an expert paid by the Division of Public Defender Services [PDS].' Both this motion and the subsequent motion for review were denied." *State* v. *Martinez,* supra, 106 Conn. App. 552–55 (*Bishop, J.,* dissenting).

We begin our analysis with the applicable standard of review. The trial court's assessment of the defendant's

---

[18] The court added that it would reconsider its decision if the defendant talked to the lab and provided the state with information about who he intended to retain and as to the cost of such expert. If the state agreed to the expert and if there was a joint stipulation, the court said it would be "happy to approve it."

offer of proof pertaining to whether he was indigent and was, therefore, eligible for state funded expert assistance, is a factual determination "subject to a clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *19 Perry Street, LLC* v. *Unionville Water Co.*, 294 Conn. 611, 626, 987 A.2d 1009 (2010).

"It is the duty of the state to provide adequate means to assure that no indigent accused lacks full opportunity for his defense . . . ." *Cooper* v. *Matzkin*, 160 Conn. 334, 340, 278 A.2d 811 (1971). "The right to legal and financial assistance at state expense is, however, not unlimited. Defendants seeking such assistance must satisfy the court as to their indigency . . . ." *State* v. *Hudson*, 154 Conn. 631, 637, 228 A.2d 132 (1967); see also *State* v. *DeJoseph*, 3 Conn. Cir. Ct. 624, 635, 222 A.2d 752 ("The defendant had peculiar knowledge of his own economic status and of his ability to raise funds for his defense. It was therefore incumbent on him, as the moving party, to persuade the court by any means available to him that he was entitled to counsel at public expense."), cert. denied, 153 Conn. 747, 220 A.2d 771, cert. denied, 385 U.S. 982, 87 S. Ct. 526, 17 L. Ed. 2d 443 (1966); *State* v. *Flemming*, 116 Conn. App. 469, 481, 976 A.2d 37 (2009) ("the applicant for public defender services bears the burden of proving indigency"). This has largely been accomplished through PDS; see *State* v. *DeJoseph*, supra, 635–37; which has promulgated guidelines that are instructive as to the threshold indigency determination. See generally Guidelines for Determining Financial Eligibility for Public Defender Services (1993) (Financial Eligibility Guidelines).

General Statutes § 51-297 (a)[19] requires the public defender's office to investigate the financial status of an individual requesting representation on the basis of indigency, whereby the individual must, under oath or affirmation, set forth his liabilities, assets, income and sources thereof. See *State* v. *Flemming,* supra, 116 Conn. App. 481 ("the office of the public defender is the *only* entity upon which a statutory duty is imposed to investigate a claim of indigency" [emphasis in original; internal quotation marks omitted]). Further, when a defendant who is seeking the services of a public defender is living with a parent, the eligibility of the accused "shall also be evaluated on the basis of the financial circumstances of the accused *and* the parents or legal guardians." (Emphasis added.) Financial Eligibility Guidelines, supra, § 7 (d). General Statutes § 51-296 (a) requires that, "[i]n any criminal action . . . the court before which the matter is pending shall, if it determines after investigation by the public defender or his office that a defendant is indigent as defined under this chapter, designate a public defender . . . to represent such indigent defendant . . . ." Upon a determination by the public defender that an individual is not eligible for its services, "the individual may appeal the decision to the court before which his case is pending." General Statutes § 51-297 (g).

Our review of the record indicates that the trial court's determination that the defendant did not sustain his burden of proving indigency and, thus, was not entitled to a state funded DNA expert, was not clearly

---

[19] General Statutes § 51-297 (a) provides in relevant part: "A public defender . . . shall make such investigation of the financial status of each person he has been appointed to represent or who has requested representation based on indigency, as he deems necessary. He shall cause the person to complete a written statement under oath or affirmation setting forth his liabilities and assets, income and sources thereof, and such other information which the commission shall designate and require on forms furnished for such purpose."

erroneous. See *State* v. *Harris*, 5 Conn. Cir. Ct. 313, 315, 250 A.2d 719 (1968) ("the determination of indigency must be made at the trial level; trial judges are in the best position administratively to decide that question"). Although the defendant filed a motion requesting the appointment of an expert to interpret the DNA evidence, the record is devoid of any effort by the defendant to offer evidence in support of his motion. Indeed, the defendant utterly failed to seek to introduce any evidence at the hearing on his motion or even to make an offer of proof as to evidence that he would like to present. Although the defendant filed an affidavit regarding his inability to pay for an expert, that affidavit did not include any information concerning his liabilities or assets or those of his mother with whom he was living.[20] Moreover, as the trial court recognized, the defendant was represented by private counsel after refusing to permit a public defender to represent him. See, e.g., *State* v. *Nash*, 149 Conn. 655, 660, 183 A.2d 275 ("the defendant had the right, which he insisted on exercising, of refusing to permit the public defender to represent him"), cert. denied, 371 U.S. 868, 83 S. Ct. 130, 9 L. Ed. 2d 104 (1962); *State* v. *Guitard*, 61 Conn. App. 531, 539, 765 A.2d 30 (2001) (trial court properly found that defendant did not prove indigency because, inter alia, he was represented by private attorney). Therefore, because the burden of proving indigence lies with the defendant, and he failed to provide the court with sufficient proof of such indigence, we conclude that the trial court properly denied his request for a state funded DNA expert.[21] Consequently, the record is

---

[20] Of the six declarations contained in the affidavit, only one touched on a subject of finances, when the defendant stated that "I am unable to work due to restrictions imposed by the court." We note that under *any* reasonable framework, assets would be considered in determining indigency, a consideration that the defendant does not dispute.

[21] The defendant, nevertheless, contends that the trial court was required to conduct an indigency hearing before denying his motion. "We consistently have held that, unless otherwise required by statute, a rule of practice or a rule of evidence, whether to conduct an evidentiary hearing generally is

inadequate for us to reach the constitutional issue, as the defendant has failed to establish the threshold requirement of his indigency.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion the other justices concurred.

a matter that rests within the sound discretion of the trial court." *State* v. *Nguyen,* 253 Conn. 639, 653, 756 A.2d 833 (2000). Furthermore, "our statutory scheme assigns the duty of investigating claims of indigency solely to the public defender." *State* v. *Flemming,* supra, 116 Conn. App. 482. Accordingly, the court had no statutory duty to conduct an indigency hearing and, therefore, it was within the court's discretion not to conduct such a hearing. See id. ("[w]e need not determine whether the proceedings between the court and [the attorney from the public defender's office] constituted an 'indigency hearing,' as the court was under no obligation to conduct such a hearing"). We note, however, that the trial court *did* make a factual determination as to the defendant's indigency status after reviewing the defendant's motion for the appointment of a DNA expert and his affidavit supporting that motion. As the trial court stated, after the defendant's proffer, "I don't think there's enough of a showing [of indigence] at this point in time" and, later, that "I'm going to deny the motion at this time based upon the availability of funds to the defendant . . . ."